#26101-a-DG

**2013 S.D. 11**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

\* \* \* \*

CARMEN COLETTE SCHIEFFER,          Plaintiff and Appellant,

v.

KEVIN VICTOR SCHIEFFER,          Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

\* \* \* \*

LINDA LEA M. VIKEN
KYLIE M. RIGGINS of
Viken Law Firm
Rapid City, South Dakota          Attorneys for plaintiff
                                  and appellant.


THOMAS J. WELK
JASON R. SUTTON of
Boyce, Greenfield, Pashby & Welk, LLP
Sioux Falls, South Dakota          Attorneys for defendant
                                   and appellee.

\* \* \* \*

ARGUED OCTOBER 2, 2012

OPINION FILED **01/23/13**

#26101

GILBERTSON, Chief Justice

[¶1.]     On July 12, 2011, the trial court granted Kevin Schieffer and Carmen Schieffer a divorce on grounds of irreconcilable differences.  In its judgment and decree of divorce, the trial court denied Carmen's request to relocate to New York City with the minor children, granted Kevin and Carmen joint legal and physical custody of the minor children, implemented a custody schedule, ordered Kevin to pay Carmen child support, resolved the disputed property issues, and denied Carmen's request for attorney fees.  Carmen appeals various aspects of the trial court's decision.  We affirm.

## FACTS

[¶2.]     Kevin and Carmen met in 1999.  From 1999 to 2007, Kevin and Carmen were involved in an "on again, off again," long distance relationship, with Kevin primarily residing in Sioux Falls, South Dakota, and Carmen living various places including New York City, New York.  While in New York City, Carmen was employed as a vice president of an international insurance and investment company.  Kevin worked as the CEO of Dakota, Minnesota, and Eastern Railroad (DM&E) in Sioux Falls.  Kevin was also a shareholder of DM&E.

[¶3.]     Kevin amassed a considerable amount of wealth throughout his career, acquiring much of his wealth as a result of the sale of DM&E in October 2007. Kevin was required to continue working for DM&E during a period of transition as part of the sale.  However, after completing the transition in October 2008, Kevin ceased working for DM&E.  Neither Kevin nor Carmen has worked outside of the home since that time.

[¶4.] In 2007, the parties learned Carmen was pregnant. Kevin and Carmen then married on September 22, 2007.[1] The parties' daughter (AC-AS) was born on March 6, 2008. AC-AS was born with Down syndrome. In addition, AC-AS was born with a heart defect that required her to have surgery in New York City shortly after her birth. As a result, Carmen and AC-AS lived in New York City for approximately the first five months of AC-AS's life. Carmen and AC-AS then moved to Sioux Falls to live with Kevin.

[¶5.] AC-AS has received various services and therapies to help treat the symptoms of her Down syndrome since her birth. These services include physical therapy, occupational therapy, speech therapy, music therapy, etc. Some of these services are provided by the State of South Dakota.[2] However, Kevin and Carmen have continuously supplemented these services with "private pay" therapy services. Typically, AC-AS participates in at least 12 hours of therapist-led therapy sessions each week. Additionally, Carmen has pursued alternative treatments for AC-AS. For example, AC-AS is on a special diet and takes various vitamins and supplements daily.

---

1. Kevin and Carmen signed a prenuptial agreement prior to their marriage. According to the prenuptial agreement, Carmen was entitled to a payment of $5 million if she did not seek spousal support in the event of a divorce, and $1 million if she did pursue spousal support.

2. From birth to age three, the therapy services provided to AC-AS by the State were determined based upon recommendations from AC-AS's Individualized Family Service Plan (IFSP). At age three, the services provided to AC-AS under her IFSP terminated. The Sioux Falls School District then evaluated AC-AS and determined the new level of State-provided therapy she should be awarded. An Individual Education Plan (IEP) was created for AC-AS based on this evaluation.

[¶6.] On October 15, 2009, Carmen formally notified Kevin that she intended to relocate from Sioux Falls to New York City because she believed facilities in New York City could provide AC-AS with better therapy services and educational opportunities. At the time, Carmen was pregnant with the parties' son (AE-VS). Kevin resisted the proposed relocation. As a result, Carmen filed a complaint on December 14, 2009, in which she sought separate maintenance, custody, child support, permission to relocate, and attorney fees. In response, Kevin objected to the proposed relocation and counterclaimed for a declaratory judgment based on the parties' prenuptial agreement.

[¶7.] The trial court held a hearing on February 11-12, 2010, to address the interim issues of child support, visitation, and attorney fees. After the hearing, the trial court entered a memorandum decision and interim order to establish the rights and obligations of the parties until the occurrence of a trial, which was originally set for July 2010, but was later moved to November 2010. Kevin and Carmen's son AE-VS was born on May 4, 2010.

[¶8.] On October 11, 2010, Kevin amended his answer and counterclaim, seeking a divorce from Carmen on the grounds of irreconcilable differences. Prior to their divorce trial, Kevin and Carmen stipulated to the enforceability of their prenuptial agreement. The parties' divorce trial was held on November 15-19, 2010. At trial, Kevin and Carmen disputed various issues. Some of the more significant issues included: whether New York City could provide better services to AC-AS than Sioux Falls; whether AC-AS participated in an appropriate amount of therapy; and whether the type and quantity of supplements AC-AS was taking was

appropriate. Over the course of the trial and prior hearings, the parties and more than 15 experts provided testimony regarding these and other issues.

[¶9.] On March 4, 2011, the trial court entered extensive findings of fact and conclusions of law based on the evidence presented at both the February 2010 hearing and the November 2010 trial. However, both parties moved for reconsideration/clarification/amendment of the trial court's findings. The trial court addressed these motions at a hearing held on May 23, 2011. On July 12, 2011, the trial court entered an order on the parties' motions for reconsideration, a judgment and decree of divorce, and amended findings of fact and conclusions of law.

[¶10.] The trial court's amended findings of fact and conclusions of law consisted of 161 findings and 47 conclusions that were incorporated by reference into the judgment and decree of divorce. This Court addresses only those portions of the judgment and decree of divorce that are relevant to this appeal. In its judgment and decree of divorce, the trial court granted Kevin a divorce based upon irreconcilable differences and denied Carmen's request to relocate to New York City. The trial court ordered Kevin to pay Carmen $3,971,973.90 to satisfy the $5 million total she was entitled to under the prenuptial agreement. In addition, the trial court awarded Kevin and Carmen joint legal and physical custody of AC-AS and AE-VS. The trial court also adopted a modified version of the custody schedule proposed by Dr. Price (Kevin's expert).

[¶11.] With regard to AC-AS's therapy, the trial court ordered that the State-provided therapy granted to AC-AS under her IEP would be the minimum amount of therapy AC-AS would receive. The trial court also ordered that the

recommendations of AC-AS's doctor (Dr. Blake) would control matters in which the parties disagreed about the healthcare needs of the children, including disputes about additional therapy for AC-AS. Further, the trial court ordered that Kevin be permitted to take part in determining the appropriate financial terms for certain services Carmen specifically wanted AC-AS to participate in, assuming Dr. Blake found these services to be appropriate.

[¶12.] Additionally, the trial court rejected Carmen's request for child support of more than $25,000 per month. In Carmen's reply brief and Exhibit 423, Carmen clarifies that approximately $9,200 of the $25,000 total is attributable to costs associated with the children's actual needs and standard of living ("base" child support), while the remaining costs of $15,800 are attributable to AC-AS's special needs. In rejecting Carmen's child support request, the trial court instead ordered Kevin to pay Carmen "base" child support of $2,815 per month. The trial court also ordered Kevin to pay for health insurance for the children, 95 percent of AC-AS's therapy costs, 95 percent of the supplemental costs associated with AC-AS's special needs, 95 percent of the children's uncovered medical expenses, 95 percent of the nanny expenses incurred until AC-AS entered preschool, and 95 percent of private school tuition (if applicable). Finally, the trial court denied Carmen's request for attorney fees of more than $370,000. Carmen appeals several of the trial court's determinations.

## STANDARD OF REVIEW

[¶13.] "[This Court] review[s] child custody decisions under the abuse of discretion standard of review." *Simunek v. Auwerter*, 2011 S.D. 56, ¶ 8, 803 N.W.2d

835, 837 (citing *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, ¶ 22, 591 N.W.2d 798, 807).  In addition, the trial court's decisions regarding child support and the division of property are reviewed for an abuse of discretion.  *Hill v. Hill*, 2009 S.D. 18, ¶ 5, 763 N.W.2d 818, 822 (citing *Billion v. Billion*, 1996 S.D. 101, ¶ 14, 553 N.W.2d 226, 230).  Further, "[a] circuit court's ruling on the allowance or disallowance of costs and attorney fees is also reviewed by this Court under the abuse of discretion standard of review."  *Terca v. Terca*, 2008 S.D. 99, ¶ 18, 757 N.W.2d 319, 324 (citing *Eccleston v. State Farm Mut. Auto. Ins. Co.*, 1998 S.D. 116, ¶ 20, 587 N.W.2d 580, 583).

[¶14.]     "An abuse of discretion is 'a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'"  *Hill*, 2009 S.D. 18, ¶ 5, 763 N.W.2d at 822 (citing *Laird v. Laird*, 2002 S.D. 99, ¶ 13, 650 N.W.2d 296, 299).  In the context of reviewing custody decisions, "[a]n abuse of discretion occurs . . . when the trial court's review of the traditional factors bearing on the best interests of the child is scant or incomplete."  *Kreps v. Kreps*, 2010 S.D. 12, ¶ 25, 778 N.W.2d 835, 843 (quoting *Pietrzak v. Schroeder*, 2009 S.D. 1, ¶ 37, 759 N.W.2d 734, 743).

[¶15.]     On appeal, findings of fact are reviewed under the clearly erroneous standard of review.  *Id.*  As a result, this Court "will overturn the trial court's findings of fact on appeal only when a complete review of the evidence leaves [this] Court with a definite and firm conviction that a mistake has been made."  *Id.*  Further, this Court gives due regard to the trial court's opportunity "to judge the credibility of witnesses and to weigh their testimony[.]"  *Walker v. Walker*, 2006

S.D. 68, ¶ 11, 720 N.W.2d 67, 70-71 (quoting *Midzak v. Midzak*, 2005 S.D. 58, ¶ 14, 697 N.W.2d 733, 738).

**ANALYSIS AND DECISION**

[¶16.]     **1.     Whether the trial court's amended findings of fact regarding the custody determination factors were clearly erroneous, causing the trial court's joint legal and physical custody award to be an abuse of discretion.**

[¶17.]     When determining custody, "the court shall be guided by consideration of what appears to be for the best interests of the child in respect to the child's temporal and mental and moral welfare." SDCL 25-4-45. "The trial court may, but is not required to, consider the following [*Fuerstenberg*] factors in determining the best interests and welfare of the child: parental fitness, stability, primary caretaker, child's preference, harmful parental misconduct, separating siblings, and substantial change of circumstances." *Simunek*, 2011 S.D. 56, ¶ 9, 803 N.W.2d at 837 (quoting *Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d at 843). In evaluating parental fitness, a trial court may consider the following subfactors:

> (1) mental and physical health; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed; (4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

*Kreps*, 2010 S.D. 12, ¶ 26, 778 N.W.2d at 843-44. Subfactors examined when considering stability include:

> (1) the relationship and interaction of the child with the parents, step-parents, siblings and extended families; (2) the child's

adjustment to home, school and community; (3) the parent with whom the child has formed a closer attachment, as attachment between parent and child is an important developmental phenomena and breaking a healthy attachment can cause detriment; and (4) continuity, because when a child has been in one custodial setting for a long time pursuant to court order or by agreement, a court ought to be reluctant to make a change if only a theoretical or slight advantage for the child might be gained.

*Price v. Price*, 2000 S.D. 64, ¶ 27, 611 N.W.2d 425, 432.

[¶18.]     "'We encourage trial courts to take a balanced and systematic approach' when applying the factors relevant to a child custody proceeding." *Simunek*, 2011 S.D. 56, ¶ 9, 803 N.W.2d at 837 (quoting *Fuerstenberg*, 1999 S.D. 35, ¶ 23, 591 N.W.2d at 807). *See also Kreps*, 2010 S.D. 12, ¶ 28-29, 778 N.W.2d at 844 (reiterating that courts should utilize a balanced and systematic approach in analyzing the various factors applicable to child custody proceedings, and clarifying that this Court has never held that the primary caretaker factor should prevail over all other factors considered by the trial court).

[¶19.]     Carmen argues that several of the trial court's amended findings of fact are clearly erroneous, and that the joint legal and physical custody award was an abuse of discretion as a result. However, Carmen's claims of error are without merit because the record supports the trial court's amended findings of fact. For example, Carmen challenges Amended Finding of Fact 74, which deals with "fitness" subfactor 5. Carmen argues the trial court committed clear error in finding that Kevin was more capable than Carmen to prepare the children for responsible adulthood while simultaneously ensuring that they had the benefit of a fulfilling childhood. She argues that she "fully appreciates the importance of

playtime, socialization, and family for children and worked hard to incorporate them all, along with the therapy AC-AS requires."

[¶20.]     However, a review of the record demonstrates that Carmen heavily favored therapy over playtime and time with family. For example, AC-AS spent over 1200 hours in therapy sessions before turning age two, yet she spent no time with other children. Further, Carmen prevented AC-AS from socializing with the children in Kevin's family, and only began allowing AC-AS to interact with other children after the February 2010 hearing. At one point during the February 2010 hearing, Carmen was asked for the names of AC-AS's playmates. Carmen replied that AC-AS had no playmates. Therefore, Amended Finding of Fact 74 was not clearly erroneous.

[¶21.]     As an additional example, Carmen argues that Amended Finding of Fact 81 is clearly erroneous. Carmen challenges the trial court's finding that she indicated she does not think family is as important as therapy. However, once again, the record supports this finding. When Carmen was asked to respond to Kevin's concern about being far from family if she and the children relocated to New York City, Carmen stated that family was very important, but that she did not think family was as important as the therapy opportunities AC-AS would have in New York. This testimony demonstrates that Amended Finding of Fact 81 was not clearly erroneous.

[¶22.]     Overall, Carmen has not shown that the trial court's amended findings of fact were clearly erroneous. As noted above, it is within the prerogative of the trial court to resolve conflicts of evidence, judge the credibility of witnesses, and

weigh the testimony of witnesses. The fact that Carmen disagrees with the trial court's findings does not mean they were clearly erroneous. Because the trial court's amended findings of fact were supported by the record, Carmen has not established that the trial court's amended findings of fact were clearly erroneous. Furthermore, a review of the record establishes that the trial court engaged in a balanced and systematic review of each of the *Fuerstenberg* factors and subfactors in finding that the best interests of AC-AS and AE-VS supported awarding Kevin and Carmen joint legal and physical custody. Specifically, the trial court devoted Amended Finding of Facts 69 through 93 (approximately 8 of the 58 pages of its amended findings of fact and conclusions of law) to providing detailed evaluations of each of these factors and subfactors. As a result, the trial court did not abuse its discretion in awarding Kevin and Carmen joint legal and physical custody of the children.

[¶23.]    **2.**    **Whether the trial court abused its discretion in adopting a modified version of the custody schedule recommended by Dr. Price (Kevin's expert)[3] instead of adopting the custody schedule proposed by Dr. Ackerman (Carmen's expert).[4]**

---

3.    As to AC-AS, the modified version of Dr. Price's schedule is a two-week schedule that essentially gives Kevin and Carmen equal time with AC-AS. As to AE-VS, the modified version of Dr. Price's custody schedule allows Kevin various day and overnight time with AE-VS on a weekly basis, with Carmen generally receiving more time with AE-VS. The schedule varies based on AE-VS's age (12-14 months, 14-16 months, and 16-18 months), and at 18 months AE-VS's schedule changes so that he is on the same schedule as AC-AS.

4.    Dr. Ackerman also proposed a two-week schedule for AC-AS. Under this schedule, Kevin had five overnights with AC-AS and Carmen had nine overnights with AC-AS over the course of two weeks. The schedule Dr.

(continued . . .)

[¶24.] "As with all witnesses, it falls on the trier of fact to decide whether to believe all, part, or none of an expert's testimony." *Great W. Bank v. H & E Enters., LLP*, 2007 S.D. 38, ¶ 10, 731 N.W.2d 207, 209 (citing *Sauer v. Tiffany Laundry & Dry Cleaners*, 2001 S.D. 24, ¶ 14, 622 N.W.2d 741, 745). As a result, "[i]t is within the [trial] court's discretion to choose between conflicting experts." *Simunek*, 2011 S.D. 56, ¶ 16, 803 N.W.2d at 838 (citing *Wise v. Brooks Constr. Servs.*, 2006 S.D. 80, ¶ 33, 721 N.W.2d 461, 472-73). Furthermore, SDCL 25-5-7.1 gives a trial court the authority to order joint legal and physical custody. In ordering joint physical custody, the trial court may award it "in such proportions as are in the best interests of the child, notwithstanding the objection of either parent." SDCL 25-5-7.1.

[¶25.] At trial, both Kevin and Carmen presented testimony from custody experts and proposed custody schedules based on this testimony. Carmen argues the trial court abused its discretion in failing to adopt the custody schedule

---

(. . . continued)

Ackerman proposed for AE-VS also varied based on AE-VS's age (0-18 months, 18-24 months, 24-30 months, 30-36 months), and at 36 months AE-VS participated in the same schedule as AC-AS. Until 36 months, Dr. Ackerman's proposed schedule gave Carmen AE-VS the majority of the time. According to Dr. Ackerman's proposed custody schedule, Kevin was generally given three hour visits with AE-VS a few times per week, and he received some overnights with AE-VS on alternating weeks. Dr. Ackerman's proposed schedule allowed Kevin more overnight visits with AE-VS as AE-VS got older.

proposed by Dr. Ackerman for several reasons. For example, she argues Dr. Ackerman was more qualified than Dr. Price in both training and experience.[5]

[¶26.]    In this case, the trial court did not abuse its discretion in finding that the adoption of a modified version of Dr. Price's proposed custody schedule was in the best interests of AC-AS and AE-VS. It was within the trial court's discretion to weigh the competing opinions of Dr. Price and Dr. Ackerman and to select one of the proposed custody schedules. The trial court chose to implement a modified version of Dr. Price's proposed custody schedule over Dr. Ackerman's proposed custody schedule because it provided the children with an equal opportunity to spend time with both parents and to develop secure attachments to both parents. The trial court found that this case was unique because both Kevin and Carmen had substantial assets which eliminated either party's need to work outside of the home, thus giving both Kevin and Carmen the ability to devote substantial time to AC-AS and AE-VS.

[¶27.]    Furthermore, the trial court chose to implement a modified version of Dr. Price's proposed custody schedule as opposed to Dr. Ackerman's proposed custody schedule because the trial court determined that Dr. Price's opinions were more consistent with modern research, scholarship, common sense, and public policy. Additionally, the trial court concluded that Dr. Ackerman's proposed

---

5.    As an additional argument regarding custody/visitation schedules, Carmen argues the interim visitation plan implemented after the February 11-12, 2010, hearing was improper for multiple reasons. However, "[i]t is settled law in this State that a temporary custody order no longer in effect is not subject to review." *In re A.M.L.*, 371 N.W.2d 358, 359 (S.D. 1985). Therefore, we decline to address this argument on appeal.

schedule would unreasonably and unnecessarily limit the children's ability to attach to Kevin.

[¶28.]     As previously mentioned, the trial court was vested with the discretion to weigh the opinions of the experts and to select the proposed custody schedule it found to be most consistent with the best interests of AC-AS and AE-VS.  Overall, the record supports the trial courts findings and supports its decision to adopt a modified version of Dr. Price's proposed custody plan.  Therefore, the trial court did not abuse its discretion in adopting a modified version of the custody plan proposed by Dr. Price.

[¶29.]     **3.     Whether the trial court abused its discretion in allowing Kevin to participate in determining the financial terms of certain services for AC-AS.[6]**

---

6.     At the May 23, 2011, hearing Carmen sought clarification of the trial court's order regarding who would determine what therapies AC-AS would participate in.  Specifically, Carmen was concerned about whether the supplemental therapies AC-AS received in addition to the therapies she participated in under her IFSP would continue throughout the summer before AC-AS entered preschool because AC-AS had turned three, her IEP evaluation was not complete, and Carmen stated it would take at least three months to get an appointment with Dr. Blake to resolve disputes about AC-AS's supplemental therapy needs.  Carmen requested that the supplemental therapies AC-AS had under her IFSP continue until the parties could meet with Dr. Blake after AC-AS's IEP evaluation.  In addition to Carmen's arguments regarding Kevin's involvement in determining the terms of certain services provided to AC-AS, Carmen also argues the trial court erred in giving Kevin the authority to immediately cut all of AC-AS's supplemental therapy after AC-AS's IEP evaluation.  However, Carmen mischaracterizes the trial court's decision on this issue.  The trial court did not give Kevin unilateral power to permanently cut therapy.  Instead, the trial court determined that AC-AS's current therapies would continue until the IEP plan was finalized.  At that point, the parties would make arrangements for supplemental therapies for AC-AS.  If the parties disagreed about the supplemental therapies, Dr. Blake would be consulted to resolve the disputes.

(continued . . .)

#26101

[¶30.] SDCL 25-5-7.1 provides:

> In ordering joint legal custody, the court may consider the expressed desires of the parents and may grant to one party the ultimate responsibility over specific aspects of the child's welfare or may divide those aspects between the parties based on the best interest of the child. . . . [T]he court may order, or the parties may agree, how any such responsibility shall be divided.

In awarding Kevin and Carmen joint legal custody, the trial court gave Carmen the specific authority to continue the non-speech oral motor therapies (such as TalkTools and PROMPT) that AC-AS had previously received, provided that Dr. Blake did not find these therapies to be harmful to AC-AS.[7] The trial court also gave Carmen the authority to decide whether or not to utilize a Special Education Itinerant Teacher (SEIT) to assist AC-AS when AC-AS entered school. However, the trial court ordered that Kevin have the authority to participate in determining the appropriate financial terms for these services. With regard to the SEIT, Kevin was also allowed to participate in setting the reasonable duties, terms, and conditions of the employment relationship, and was allowed to participate in interviewing and hiring the SEIT.[8] Carmen argues the trial court abused its

_____

(. . . continued)
  Thus, the trial court did not give Kevin unilateral authority to permanently cut AC-AS's supplemental therapy.

7. In Amended Finding of Fact 121 the trial court stated that "unless Dr. Blake specifically advises against such therapy as being inconsistent with [AC-AS]'s best interests, the Court is of the view that Carmen should be allowed to involve Sara Rosenthal-Johnson's oral-motor therapy methods, specifically TalkTools and PROMPT, within [AC-AS]'s therapy regimen."

8. In full, Amended Finding of Fact 123 provides:
  In addition, if the parties cannot agree, then Carmen shall have authority to choose whether or not to incorporate the services of a

(continued . . .)

-14-

discretion in allowing Kevin to participate in establishing the financial terms of these services, claiming that this grant of authority essentially gave Kevin the power to block AC-AS's receipt of these services. She asserts that Kevin might require that the services be obtained at a rate that proves to be unacceptable to the therapists, making it impossible to find therapists to provide these services to AC-AS.

[¶31.] However, Carmen's argument lacks merit. In allowing Kevin to *participate* in determining the financial terms for AC-AS's non-oral motor therapies and SEIT services, the trial court did not give Kevin the power to block AC-AS's receipt of these services altogether. On the contrary, Carmen retained the full authority to continue these services assuming Dr. Blake did not find them to be inconsistent with AC-AS's best interests. Therefore, the only person with the ability to block AC-AS's receipt of the non-oral motor therapies and SEIT services is Dr. Blake.[9] Further, there is no indication that the trial court meant to allow Kevin

_____

(. . . continued)

> SEIT for [AC-AS], but with the limitation that if the decision to utilize a SEIT is made, Kevin shall participate fully and equally in the process of determining the reasonable duties, terms, and conditions of the employment relationship, interviewing and hiring the SEIT, and setting the reasonable compensation to be offered to the SEIT. [AC-AS] may utilize a SEIT or similar services for summer camps at the Excel School if the parties agree. If the parties cannot reach an agreement regarding the hiring or duties of the SEIT or similar services for the summer camps, then [AC-AS] shall be provided a SEIT or similar services if Dr. Blake determines that a SEIT or similar services for the summer camps is in [AC-AS]'s best interest.

9. With regard to the SEIT services, it is unclear from Amended Finding of Fact 123 whether Dr. Blake is to resolve all disputes regarding SEIT services, or only those disputes related to the provision of SEIT services during AC-AS's

(continued . . .)

to use his authority as a means of blocking AC-AS's receipt of these services by insisting upon financial terms that were unacceptable to the therapists. Such an understanding would be entirely inconsistent with the trial court's specific grant of authority to Carmen with regard to the continuation of these services.

[¶32.]     Instead, in reviewing the judgment and decree of divorce in its entirety, the trial court's division of authority balanced the interests of both Kevin and Carmen. In its amended findings of fact, the trial court found that Carmen's spending was irresponsible and excessive. Further, it found that the non-speech oral motor therapies were expensive and controversial, and that it was unclear whether or not the services actually caused AC-AS's speech to improve. However, the trial court found that Carmen was passionate about AC-AS's receipt of these

_____

(. . . continued)

> summer camps. Given that the trial court gave Dr. Blake the ultimate authority with regard to all of the children's healthcare needs, including the provision of therapies for AC-AS, the most appropriate understanding of Amended Finding of Fact 123 is that Dr. Blake has the authority to resolve all disputes regarding SEIT services for AC-AS. However, even if Dr. Blake only had authority to resolve disputes regarding the provision of SEIT services during AC-AS's summer camps, the trial court provided for an additional method of dispute resolution. Amended Finding of Fact 124 provides that:
>
> > Resolution of any other co-parenting issues, not expressly defined above, shall be submitted for resolution by the parties with the assistance of a mediator, or by a Parenting Coordinator agreeable to the parties. Only when such attempts have been exhausted, shall unresolved conflicts be brought before the Court, unless exigent circumstances warrant bypass directly to the judicial process.
>
> Therefore, even if the parties cannot agree on the terms and conditions of SEIT services for AC-AS, Kevin does not have the ability to block AC-AS's receipt of SEIT services altogether. Instead, a mediator or Parenting Coordinator will resolve any disputes (keeping in mind that the trial court specifically gave Carmen the authority to make the initial determination of whether or not to utilize SEIT services for AC-AS).

services and that Carmen's ability to co-parent with Kevin would be negatively impacted if these services were terminated. By giving Kevin the ability to participate in determining the financial terms of these services, the trial court balanced Carmen's interest in continuing the therapy services she strongly believed were imperative to AC-AS's improvement with Kevin's interest in ensuring that these services were provided at costs that were not unnecessary or excessive. Therefore, although Kevin has the ability to give input, he does not have the authority to block AC-AS's receipt of the non-speech oral motor therapies and SEIT services. As a result, the trial court did not abuse its discretion in giving Kevin the authority to participate in determining the financial terms of AC-AS's non-speech oral motor therapies and SEIT services.[10]

[¶33.]    **4.    Whether the trial court abused its discretion in ordering Kevin to pay "base" child support of $2,815 per month.**

[¶34.]    "The court is required to set a child support obligation based on an income schedule established by the Legislature." *Hill*, 2009 S.D. 18, ¶ 6, 763 N.W.2d at 822. "[T]he combined monthly net incomes of both parents shall be used in determining the obligation which shall be divided proportionately between the

---

10.    Carmen also argues that an incident involving the SEIT issue, which occurred after the trial court entered its judgment and decree of divorce, supports her claim that the authority granted to Kevin allows him to block AC-AS's receipt of SEIT services. The incident referenced by Carmen is that AC-AS was unable to start preschool because the parties disagreed about who the SEIT would be, and who (Dr. Blake, the parties' parenting coordinator, or the trial court) would resolve the parties' dispute about selection of the SEIT. However, Carmen fails to recognize that the complication arose from the need for clarification of who would resolve disputes about selection of the SEIT, rather than from the authority Kevin had to participate in setting the terms for the SEIT. As a result, Carmen's argument fails.

parents based upon their respective net incomes." SDCL 25-7-6.2. Currently, the schedule provides child support obligation calculations up to a combined net monthly income of $20,000. *Id.*

[¶35.]      In situations where the parents' combined net monthly income exceeds $20,000, "the child support obligation shall be established at an appropriate level, taking into account the actual needs and standard of living of the child." SDCL 25-7-6.9. Further, "the trial court *may* calculate support by mathematical extrapolation, but it is not obligated to do so. . . . [T]he essential inquiry remains the actual needs and standard of living of the children." *Bloom v. Bloom*, 498 N.W.2d 213, 217 (S.D. 1993) (citing *Earley v. Earley*, 484 N.W.2d 125, 127-28 (S.D. 1992)). In addition, the party requesting child support in excess of the schedule "has the burden of proving [the] claimed expenses reflect the children's needs and standard of living." *Evans v. Evans*, 1997 S.D. 16, ¶ 20, 559 N.W.2d 240, 245 (citing *Billion*, 1996 S.D. 101, ¶ 40, 553 N.W.2d at 235). However, "[a] trial court is not required to accept either party's claimed expenses." *Id.*

[¶36.]      The trial court determined that Kevin's annual income (including the imputation of minimum wage) was $2,115,080; whereas Carmen's annual income (including the imputation of minimum wage) was $105,080. Based on these figures, the trial court concluded that the combined monthly income of the parties exceeded the $20,000 maximum provided by the child support obligation schedule. However, the trial court ultimately concluded that a child support award in excess of the child support obligation schedule was unwarranted in this case.

[¶37.] Instead, the trial court calculated "base" child support at $2,963, which was the top of the child support obligation schedule for two children. The trial court ordered that the parties bear this expense based upon the ratio of their levels of income, meaning that Kevin was responsible for paying 95 percent of this amount, and Carmen was responsible for paying 5 percent of this amount. The result of these calculations was that Kevin was responsible for making monthly child support payments of $2,815. In addition to these "base" payments, the trial court ordered Kevin to pay 95 percent of several of the children's other expenses. Carmen argues the trial court abused its discretion in calculating child support, claiming she established the actual needs and standard of living of AC-AS and AE-VS required a "base" child support award of approximately $9,200 per month.[11]

[¶38.] In determining the appropriate child support award, the trial court considered the actual needs and standard of living of both AC-AS and AE-VS. The trial court found that "base" child support of $2,963 per month properly accounted for AC-AS's and AE-VS's actual needs and standard of living. The trial court made several findings of fact to support its rationale for awarding "base" child support of $2,963. First, as to the children's needs, the trial court found that $2,963 accounted for the children's typical expenditures such as food, clothing, transportation, and housing. Next, with regard to the children's standard of living, the trial court specifically found that "[t]here is no evidence that would support the supposition

11. As previously noted, although Carmen requested over $25,000 per month in child support, only $9,200 of that total constitutes "base" child support used to provide for the children's actual needs and standard of living. The remaining $15,800 of the $25,000 total is attributable to costs associated with AC-AS's special needs.

that the children will be living an opulent or excessive lifestyle in Kevin's home. To the contrary, the evidence suggests that Kevin values fiscal discipline . . . ." In addition, the trial court found that "Kevin's current home is considerably less expensive than the current marital residence[,]" and that "the evidence shows that it is Carmen, rather than Kevin, that would be the driving force behind setting a standard of living that is inconsistent with the guidelines amounts."

[¶39.] Further, the trial court found that "[t]he only unusual costs associated with the standard of living for the children as set forth herein are the costs of [AC-AS]'s therapy, her potential SEIT, nutritional supplements, and possible private school tuition." Beyond those costs, the trial court found that "Carmen has failed to prove that additional deviation from the child support guidelines is necessary to serve the children's actual needs and standard of living." Carmen has failed to establish that these findings are clearly erroneous.

[¶40.] Because of AC-AS's special needs, most of the evidence concerning the additional expenses associated with the children related exclusively to her. However the detail of the trial court's findings on the overall issue of support show that the trial court considered the needs of each child and did not exclusively focus on AC-AS. AE-VS is two years old. If AE-VS's needs change as he ages, as is expected, the trial court will have discretion to correspondingly raise the support obligation to meet those needs, provided that Carmen can establish a "substantial change in circumstances." *See* SDCL 25-7A-22.

[¶41.] Additionally, in rejecting Carmen's request for "base" child support of approximately $9,200 per month, the trial court concluded that Carmen's proposed

expenses were inflated, speculative, and unreliable. A review of the record supports the trial court's determinations. For example, when Carmen was asked about her proposed monthly budget, Carmen was unable to provide a rationale for several of the expenses. In addition, she agreed that some of the figures were miscalculated.

[¶42.] Furthermore, the trial court found that Carmen's spending was "undisciplined" and that her spending habits exhibited her tendencies for "excess and over-indulgence." Carmen has also failed to show that these findings were clearly erroneous. The trial court determined that "it is clearly not appropriate to increase child support simply to allow a parent to enjoy a desired level of opulence." We agree. Simply because Carmen spent excessively during the parties' marriage does not mean that Kevin must maintain that standard of living following their divorce, especially given that Kevin objected to Carmen's spending during the marriage and given that the parties' young children's actual needs do not correspond with such an opulent standard of living. *See Bloom*, 498 N.W.2d at 218 (stating that "[w]hile father's income and status as a physician might establish that [designer clothes, cellos, ballet lessons, etc.] are commensurate with the children's standard of living, we are not prepared to state that the trial court abused its discretion in failing to enter such a finding or a finding that these items constitute actual needs of the children").

[¶43.] In addition, Carmen did not present any evidence to suggest that the children's standard of living would dramatically decrease following the parties' divorce if Carmen was not awarded her requested amount of child support. In fact, on appeal Carmen has not alleged that the children's needs are not being met by

the current child support award, nor has she alleged that the children's standard of living is now inconsistent with the standard of living they had before the parties' divorce. In *Ochs v. Nelson,* 538 N.W.2d 527 (S.D. 1995), this Court addressed a situation where an unmarried mother and father had considerably disproportionate standards of living because the mother's earnings were marginal and the father's earnings were substantial. In *Ochs*, this Court affirmed the trial court's decision to set child support based on a mathematical extrapolation from the child support obligation schedule even though the parties' child had never experienced his father's high standard of living because the child was young and had never lived with his father. *Id.* at 530-31 (holding that child was entitled to share in some of father's high standard of living even though child only resided with mother).

[¶44.]     However, this case is distinguishable from *Ochs*. Unlike the mother in *Ochs*, Carmen has substantial assets of her own. Specifically, under the prenuptial agreement, Carmen received a total of $5 million as part of the parties' divorce. In addition, the trial court found that Carmen's net monthly income including child support would be over $9,000, which does not account for the $1 million the trial court expected Carmen to set aside to purchase a home, furnishings, etc. Further, unlike in *Ochs*, in this case there is no indication that AC-AS and AE-VS will experience substantially disproportionate standards of living at the homes of Kevin and Carmen. As noted above, although Kevin has a higher income and a greater net worth than Carmen, Kevin is more financially conservative than Carmen. Therefore, it appears that both Kevin and Carmen will maintain reasonably equivalent standards of living. The fact that the concerns this Court expressed in

*Ochs* regarding situations involving parents with disproportionate standards of living do not exist in this case provides further support for the trial court's determination that a child support award in excess of the child support obligation schedule was unnecessary in this case. Additionally, if at some point Kevin's and Carmen's standards of living become disproportionate, this disproportionality may be considered for purposes of modification of the child support award pursuant to SDCL 25-7A-22 in order to maintain the children's standard of living.[12]

[¶45.]       Overall, Carmen has failed to establish that the trial court's amended findings of fact regarding its determination of the appropriate child support award were clearly erroneous. As a result, the trial court did not err in concluding that Carmen did not meet her burden of proving that her claimed expenses of approximately $9,200 per month reflected the actual needs and standard of living of each of the children. Thus, the trial court did not abuse its discretion in determining that the actual needs and standard of living of the children would be provided for by Kevin paying Carmen "base" child support of $2,815 per month.

[¶46.]       Finally, in evaluating the child support award, it is important to note that the trial court did not give Kevin an abatement or cross-credit on his child

---

12.   However, in reaching this conclusion, we note that neither party is able to unilaterally control the children's standard of living, and consequently the child support award. Specifically, Carmen cannot dictate the expenditure of Kevin's wealth for child support by spending money excessively. Similarly, Kevin cannot deny his children the child support to which they are entitled by being overly conservative with his finances, thus preventing his children from receiving the benefit of his wealth. Instead, the ultimate decision as to the appropriate child support obligation rests within the sound discretion of the trial court.

support obligation even though the children would be living with Kevin 50 percent of the time.[13] This is significant because the obligations set forth in the child support obligation schedule are typically applied to situations where one parent has primary physical custody of the child(ren) and the other parent only has visitation. Further, it is also important to note that Kevin will be paying substantially more than $2,815 each month to cover other costs associated with the children.[14] In addition to the monthly "base" payments of $2,815, the trial court ordered Kevin to pay for health insurance for the children, 95 percent of AC-AS's therapy costs, 95 percent of the supplemental costs associated with AC-AS's special needs, 95 percent of the children's uncovered medical expenses, 95 percent of the nanny expenses incurred until AC-AS entered preschool, and 95 percent of private school tuition (if applicable).

[¶47.]     According to Carmen's own estimates, the additional expenses associated with AC-AS's special needs alone total approximately $15,800 per month (making Kevin's share of these expenses approximately $15,010). Consequently, when taking into account both the "base" child support payment of $2,815 and the

---

13.    Under the current version of SDCL 25-7-6.14, the trial court had discretion to grant Kevin an abatement given that the children would be residing with Kevin half of the time each month. This would have lowered Kevin's child support obligation by between 38 percent and 66 percent for the nights the children stayed with Kevin. Further, SDCL 25-7-6.27 provides the trial court with discretion to grant parties a cross-credit on the child support obligation when certain conditions are met. Based on the mathematical formula provided in SDCL 25-7-6.27, if the trial court had given Kevin a cross-credit, his child support obligation would have been approximately $2,000 as opposed to $2,815.

14.    We acknowledge that Kevin's payment of these additional expenses does not go towards the maintenance of the children's standard of living.

additional payment of $15,010, Kevin will be paying more than $17,825 per month in child support.

[¶48.]    In this case, Carmen has failed to establish that the trial court's child support award was "not justified by, and clearly against, reason and evidence." *See Hill*, 2009 S.D. 18, ¶ 5, 763 N.W.2d at 822. Accordingly, the trial court did not abuse its discretion in rejecting Carmen's request for "base" child support of approximately $9,200 per month and instead ordering Kevin to pay monthly "base" child support of $2,815. As previously discussed, if the actual needs of either AC-AS or AE-VS change in the future, the trial court has continuing jurisdiction to modify the child support order pursuant to SDCL 25-7A-22 in order to meet the children's actual needs.

[¶49.]    **5.    Whether the trial court abused its discretion in dividing the property by rejecting Carmen's request for reimbursement of $6,000 she claimed she paid Kevin.**

[¶50.]    When dividing property, "a trial court 'is not bound by any mathematical formula but shall make such award from the material factors before [it] having due regard for equity and the circumstances of the parties.'" *Grode v. Grode*, 1996 S.D. 15, ¶ 9, 543 N.W.2d 795, 800 (alteration in original) (quoting *Hanson v. Hanson*, 252 N.W.2d 907, 908 (S.D. 1977)). In this case, the parties' prenuptial agreement generally controlled the property division. Prior to trial, Kevin paid Carmen $1 million of the $5 million total he owed her under the prenuptial agreement. Therefore, at the time of trial Kevin still owed Carmen $4 million. At trial, the parties disputed whether Kevin was entitled to receive certain offsets for payments Kevin believed he should be reimbursed for. Ultimately, the trial court found that Kevin was entitled to an offset of $28,026.16 for expenses

Carmen agreed she was responsible for paying. The trial court rejected Kevin's requests for other offsets totaling more than $300,000.

[¶51.] Additionally, at trial Carmen requested a credit for $6,000. Carmen claimed she wrote a $6,000 check on the parties' joint account, but then attempted to stop payment on the check after Kevin requested that she no longer use their joint account. Believing that her attempt to stop the check was unsuccessful, Carmen claimed she paid Kevin $6,000 from her personal account to cover the check. However, Carmen claims that when she later requested that the $6,000 be returned because payment of the check had been stopped, Kevin refused. The trial court denied Carmen's request for a $6,000 credit. Carmen appeals this ruling.

[¶52.] A review of the record establishes that the trial court did not abuse its discretion in dividing the property under the prenuptial agreement. The record shows that the trial court considered the evidence presented by each party with regard to the disputed property, and then divided the property. In doing so, the trial court denied most of Kevin's requests for offsets, and gave Carmen various property despite Kevin's objections. Overall, the record demonstrates that the distribution of property was equitable.

[¶53.] Further, the trial court found that there was insufficient evidence to support Carmen's request for a credit of $6,000. The record supports this finding. First, when Carmen was asked at trial about the cash she allegedly paid Kevin, Carmen initially indicated the amount was $5,000, but later stated it was $6,000. Next, it was unclear whether the $6,000 Carmen claimed she paid Kevin came from her own personal account, or whether it was Kevin's money. Finally, Carmen failed

to provide any evidence, such as account statements, to support her testimony. Therefore, the trial court did not err in finding the evidence was insufficient to support Carmen's claim. As a result, the trial court did not abuse its discretion in dividing the property when it denied Carmen's request for a credit of $6,000.

[¶54.]    **6.    Whether the trial court abused its discretion in denying Carmen's request for attorney fees of more than $370,000.**

[¶55.]    Generally, trial courts may award attorney fees in cases involving divorce, support, or alimony. SDCL 15-17-38. A two-step analysis is used by courts in determining whether to award attorney fees. *Urbaniak v. Urbaniak*, 2011 S.D. 83, ¶ 31, 807 N.W.2d 621, 628.

> First, the court must determine what constitutes a reasonable attorney's fee. This requires consideration of (1) the amount and value of the property involved, (2) the intricacy and importance of the litigation, (3) the labor and time involved, (4) the skill required to draw the pleadings and try the case, (5) the discovery utilized, (6) whether there were complicated legal problems, (7) the time required for the trial, and (8) whether briefs were required. Second, it must determine the necessity for such fee. That is, what portion of that fee, if any, should be allowed as costs to be paid by the opposing party. This requires consideration of the parties' relative worth, income, liquidity, and whether either party unreasonably increased the time spent on the case.

*Id.* (quoting *Edinger v. Edinger*, 2006 S.D. 103, ¶ 17, 724 N.W.2d 852, 858).

[¶56.]    In this case, Carmen requested that the trial court order Kevin to pay her attorney fees of over $370,000. However, the trial court denied this request and ordered the parties to pay their own attorney fees. In denying Carmen's request for attorney fees, the trial court considered the appropriate factors and specifically found that each party had sufficient assets to pay his or her own attorney fees. The fact that Kevin has more liquid assets than Carmen does not mean that Kevin is

required to pay Carmen's attorney fees. Further, the trial court found that Carmen increased her own litigation costs by calling numerous experts, including some that were cumulative and/or unpersuasive. Finally, the trial court found that Kevin did not engage in conduct that increased Carmen's costs. These findings were supported by the record. Therefore, the trial court did not abuse its discretion in denying Carmen's request for attorney fees.

[¶57.]    Additionally, both parties submitted motions for appellate attorney fees in this case. Kevin requests appellate attorney fees and costs of $11,030.05. Carmen requests appellate attorney fees and costs of $29,910.78. Upon consideration of the factors described above, we conclude that neither party is entitled to an award of appellate attorney fees. As a result, the parties' motions for appellate attorney fees are denied.

**CONCLUSION**

[¶58.]    The trial court's extensive amended findings of fact and conclusions of law demonstrate that the trial court thoroughly reviewed the evidence and weighed it accordingly. The amended findings of fact are supported by the record and are not clearly erroneous. Furthermore, the trial court's resolution of the issues disputed by the parties is supported by the evidence. As a result, the trial court's decisions as to custody, child support, property division, and attorney fees were not an abuse of discretion. Affirmed.

[¶59.]    SEVERSON and WILBUR, Justices, concur.

[¶60.]    KONENKAMP and ZINTER, Justices, concur in part and dissent in part.

#26101

KONENKAMP, Justice (concurring in part and dissenting in part).

[¶61.] In this case, the father earns a monthly income of better than $176,000. Yet the trial court limited his child support payment to the guideline amount for parents earning a combined monthly income of $20,000. With a single sentence, the court rejected the mother's entire budget: "The court discredits her expenses as inflated, speculative, and unreliable." No details were given on how, in the court's view, all the mother's expenses were objectionable. Acting under the misbelief that the tables in the child support schedule set the limit for gauging standard of living, the court found that the mother "would be the driving force behind setting a standard of living that is inconsistent with the guideline amounts." This was an error of law, as well as an abuse of discretion.

[¶62.] Our child support schedule, based on average family expenditures, is only a starting point for high-income earners. No presumption exists in South Dakota that the correct child support for high earners is the ceiling amount set out in the schedule tables. On the contrary, "For a combined net income above the schedule in § 25-7-6.2, the child support obligation *shall* be established at an appropriate level, taking into account the actual needs *and* standard of living of the child." SDCL 25-7-6.9 (emphasis added). What measure, then, should be used to determine the "appropriate level" of child support for parents earning extraordinarily high incomes?

[¶63.] Certainly, in this type of case, it would be unsuitable to order child support calculated purely by linear upward extrapolation from the income and support amounts listed in the guidelines. Such an arbitrary method would have no

-29-

necessary relationship to the children's needs or standard of living, and might well infringe upon the parents' shared right to make lifestyle choices for their children. When earnings exceed the guideline schedule, therefore, the Legislature left to the courts the work of setting the "appropriate" child support, most likely because such awards defy mathematical formulas. On the other hand, limiting the award to the ceiling amount provided in the base schedule ignores the legislative command that for higher level income the "child support obligation *shall* be established at an appropriate level" considering needs in context with standard of living. *See id.* (emphasis added). Since high-income families live well above subsistence levels, both needs and standard of living must be considered in the parents' distinctive circumstances. Where high wealth is concerned, necessities and luxuries are relative.

[¶64.] In affirming the child support award, this Court proclaims that trial courts are not required to go above the guidelines, without considering the trial court's erroneous view of the law and the significant variance this case presents. Little guidance can be gleaned from the cases the Court cites. In *Bloom*, the paying parent earned something over $4,000 a month, 498 N.W.2d at 217; in *Billion*, $7,000 a month, 1996 S.D. 101, ¶ 39, 553 N.W.2d at 235; and in *Evans*, $25,000 a month, 1997 S.D. 16, ¶ 18, 559 N.W.2d at 244. But here the father's income is not simply off the charts — it dwarfs the earnings in those other cases. This parent earns an extraordinary income, far beyond anything contemplated in the guidelines. Yet the trial court capped the child support at the guideline amount for parents earning a fraction of what the father earns here. In such circumstances, closer

appellate review is required than merely incanting formulaic language about discretion. And it certainly lends no weight to the Court's decision that it declares that the parents' standard of living is "equivalent." The father has holdings of sixty million dollars and earns over $176,000 a month; the mother has something less than five million and earns $8,756 a month. How does that compute to an equal standard of living?

### 1. Standard of Living

[¶65.]     Children should share in their parents' standard of living. In measuring standard of living for child support purposes, the test is not whether the high-income payer chooses to live a frugal lifestyle, as the Court here seems to suggest; the test is to determine the standard of living the children would have enjoyed had it not been for the divorce. *See Billion*, 1996 S.D. 101, ¶ 41, 553 N.W.2d at 235 (citing *Ochs*, 538 N.W.2d at 531). That measure incorporates both parents' values. Indeed, our child support guidelines are premised on the belief that children are entitled to the same level of expenditures they would have received had the parents lived together and combined their financial resources. *See* Report of the South Dakota Commission on Child Support (December 2008). And the job of the trial court is to reconcile the critical tension between competing parents to ascertain the appropriate standard of living.

[¶66.]     In jurisdictions where these questions arise more frequently, courts have embraced "the recognition that the appropriate standard of living for a child of affluent parents is affluence matching that of the parents. . . ." Laura W. Morgan, Child Support Guidelines Interpretation & Application § 8.07, *Deviating from the*

*Guidelines* (2013). One parent cannot control the children's standard of living. *Id.* Seldom have we had occasion to examine child support for extremely high-income earners such as here, but in cases where the income was well above the guidelines, we have generally espoused a similar view. *See Ochs*, 538 N.W.2d at 531 (child can "partake in some of his father's high standard of living while he is with his mother"); *Evans*, 1997 S.D. 16, ¶ 17, 559 N.W.2d at 244 (child support provided "luxurious lifestyle" for the children).

[¶67.] It is always a matter of balance, of course, between setting an amount that will care for the children's actual needs *and* permit them to enjoy a standard of living commensurate with what they would have had if the parents had not been divorced. This does not mean that children must be supported at the highest standard of living attainable by the parents' income.[15] Overreaching in the name of benefitting the children should be discouraged, but the notion that the parent receiving child support should not benefit at all in the children's standard of living is simply unrealistic. When children share in the standard of living of both parents, child support may appropriately improve the standard of living of the receiving parent in order to improve the lives of the children.[16]

---

15. This is sometimes called the "Three Pony Rule." No child, no matter how wealthy the parents, needs more than three ponies. *In re Marriage of Patterson*, 920 P.2d. 450, 455 (Kan. Ct. App. 1996).

16. *In re Marriage of Cheriton*, 92 Cal. App. 4th 269, 294-95 (Cal. Ct. App. 2001); *Strahan v. Strahan*, 953 A.2d 1219, 1225-26 (N.J. Super. Ct. 2008); *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 579-80 (Tex. Ct. App. 1997).

[¶68.] As other courts have noted, child support should provide the receiving parent with adequate resources to support the children in a lifestyle the parents would have had if they remained together. *See Nash v. Mulle*, 846 S.W.2d 803, 805 (Tenn. 1993) (one of the primary goals of guidelines is to allow children of wealthy parents to share in a very high standard of living); *see also Bagley v. Bagley*, 632 A.2d 229, 238 (Md. Ct. App. 1993) (children of affluent noncustodial parents are entitled to benefits of affluent standard of living). Reasonable needs of affluent children may include items that would be frivolous for children of less-well-off parents. *In re Marriage of Nimmo*, 891 P.2d 1002, 1007 (Colo. 1995) (children entitled to "fruits of one parent's good fortune"). Where courts fail to account for a high earner's standard of living in setting child support, an abuse of discretion occurs.[17]

### 2. Additional Amounts

[¶69.] The Court makes much of the fact that the father must pay, in addition to child support, ninety-five percent of the children's expenses. But most of these payments go toward the parents' special-needs daughter. These costs include supplemental expenses, such as therapy, her potential SEIT, nutritional supplements, and possible private school tuition. Also, the father pays uncovered

---

17. *See McGinley v. Herman,* 50 Cal. App. 4th 936, 944-46 (Cal. Ct. App. 1996) (reversing an award of $2,150 a month where the supporting parent's monthly income exceeded $116,000); *In re Marriage of Hubner,* 205 Cal. App. 3d 660, 667-69 (Cal. Ct. App. 1988) (trial court erred by awarding less than one-half the discretionary guideline amount where the supporting parent's gross monthly income exceeded $43,000); *In re Marriage of Catalano,* 204 Cal. App. 3d 543, 552-53 (Cal. Ct. App. 1988) (error to award $1,110 a month where the supporting parent's gross monthly income was $32,000).

medical costs, and the children's health insurance. None of these amounts goes toward the children's standard of living. This Court also emphasizes that the parents share custody of the children. Yet the father did not request any abatement or cross-credit, and the circuit court specifically found that "[a]batement or shared parenting cross-credit are discretionary and are not warranted under the facts of this case."

[¶70.]    Considering the father's income of over $176,000 a month and the parents' combined income of $185,000 per month, the child support award of $2,815 for two children was inadequate to provide for their needs *and* standard of living. This matter should be reversed and remanded for a new determination of "appropriate" child support based on the record and arguments of counsel.[18]

ZINTER, Justice (concurring in part and dissenting in part).

[¶71.]    I concur on all issues except the matter of child support. On that issue, I join Justice Konenkamp's dissent.

[¶72.]    I write to explain the trial court's error in calculating the base child support. In its analysis, the court first noted the disparity in the parties' incomes. Because of that disparity, the court indicated that the base support obligation would be prorated, with Kevin being responsible for ninety-five percent. The court also indicated that the base support obligation would be based on both "the actual needs and standard of living for the minor children[.]" Amended Finding of Fact 141.

_____

18.    Reasonable appellate attorney's fees should be awarded to the mother in connection with this issue.

[¶73.] But the court erred as a matter of law in then determining the base obligation to prorate.[19] The court determined that "in order to provide for the children's actual needs and standard of living," the base obligation should be the top scheduled amount for two children in the support obligation table. Amended Finding of Fact 142. *See also* SDCL 25-7-6.2. Although the Schieffers' joint income was approximately $185,000 per month, the top scheduled amount only applied to parents with joint monthly income of $20,000. *See* SDCL 25-7-6.2. Nevertheless, the court believed that the top scheduled amount was appropriate because it "accurately estimates the actual needs and standard of living for the minor children." Amended Finding of Fact 142. The court believed that the top scheduled amount included the "typical" needs of children. *Id.* However, the needs and standard of living of children with parents earning $185,000 per month are not

---

19. As the majority notes, in addition to paying his share of the base obligation, Kevin was ordered to pay his pro rata share of the cost associated with the special needs of his daughter. The court also required Kevin to pay his pro rata share of both children's medical insurance, uninsured medical expenses, and child care. This additional support is substantial. But the majority incorrectly concludes that this additional support justifies the trial court's determination of the base support obligation.

   The base child support obligation is calculated in accordance with SDCL 25-7-6.2. Support for special needs is awardable under SDCL 25-7-6.10. Medical and child care support is awardable under SDCL 25-7-6.16 and 6.18. The support awardable under the latter three statutes is support *in addition* to the base support awardable under SDCL 25-7-6.2. The trial court correctly awarded the additional support. But the award of additional support for the specific costs addressed in SDCL 25-7-6.10, 6.16, and 6.18 does not cure a trial court's erroneous determination of the base support under SDCL 25-7-6.2. That is because the costs of special needs, medical insurance, unreimbursed medical expenses in excess of $250, and child care are not factored into the scheduled amounts required to be paid for base support. Report of the South Dakota Commission on Child Support (Dec. 2008).

typical; and the top scheduled amount is not based on the actual needs and standard of living of children with parents having the Schieffers' income.

[¶74.]    The base obligations in the guidelines are based on economic data reflecting the different cost of raising children in households as monthly incomes increase *up to* $20,000.[20]  The guidelines do not consider any economic data reflecting the cost of raising children in households with incomes above the top scheduled amount of $20,000.  Therefore, the court erred as a matter of law in determining that the top scheduled amount reflected the actual needs and standard of living of the Schieffers' children.  The Schieffers' income was nine times greater than the income used to determine the top scheduled amount.  Simply stated, the top scheduled amount does not purport to reflect the base obligation necessary to

---

20.    The majority errs in focusing on the age of the children at the time of the divorce (AE-VS being two years old) and then postulating that "[i]f AE-VS's needs change as he ages, as is expected, the trial court will have discretion to correspondingly raise the support obligation to meet those needs[.]"  Majority Opinion ¶ 40 (citing SDCL 25-7A-22 (allowing for a modification of support based on a substantial change in circumstances)).  *See also* ¶ 44.  The "change in circumstances" prerequisite for modifying support "survived the legislature's" adoption of child support guidelines in 1989.  *Whalen v. Whalen*, 490 N.W.2d 276, 281 (S.D. 1992).  *See also* SDCL 25-7A-22.  But the aging of children is generally not a change in circumstances authorizing the modification of support.  The majority fails to recognize that, since the guidelines' inception, base support has included the "average annual cost of raising the child to age 18."  Report of the South Dakota Commission on Child Support 14 (Dec. 1985).  Therefore, the increased cost of raising a child as the child ages is generally not a change in circumstances because it is already factored into the guidelines.  In this case, the trial court selected a base support obligation from the table that included the increasing cost of raising children as they age.  The majority is wrong in assuming that the trial court has discretion to periodically increase the base support obligation based solely on the increasing needs of children as they age.

provide for the needs and standard of living of children whose parents have a

combined income of $185,000 per month.[21]

_____

21. The trial court also erred as a matter of law in finding that "Carmen has failed to prove that additional deviation from the child support guidelines is necessary to serve the children's actual needs and standard of living." Amended Finding of Fact 156. Deviations from the scheduled amount are governed by SDCL 25-7-6.10. Carmen did not seek a deviation from the schedule under this statute. Carmen sought a larger base child support award for divorcing parties whose combined income was not covered by the schedule.