#27943-a-LSW
**2017 S.D. 11**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ANGELA K. CHARLSON,                                    Plaintiff and Appellee,

    v.

DONALD M. CHARLSON,                                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
BUTTE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHAEL W. DAY
Judge

\* \* \* \*

LINDA LEA M. VIKEN of
Viken & Riggins Law Firm
Rapid City, South Dakota

    and

SHELLY D. ROHR of
Wolf, Rohr, Gemberling
  & Allen, PA
St. Paul, Minnesota                                    Attorneys for plaintiff
                      and appellee.


MICHAEL K. SABERS of
Clayborne, Loos & Sabers, LLP
Rapid City, South Dakota                                    Attorneys for defendant
                      and appellant.

\* \* \* \*

ARGUED FEBRUARY 15, 2017
OPINION FILED **03/29/17**

#27943

WILBUR, Justice

[¶1.]    In this declaratory judgment action, the circuit court held that husband and wife's premarital agreement was valid and enforceable. In a subsequent decision, the court interpreted the agreement as it relates to the parties' debts and assets. Husband appeals. We affirm.

## Background

[¶2.]    Angela Smoot and Donald Charlson married in Deadwood, South Dakota in 1993. Prior to the marriage, the parties entered into a Pre-Marriage Agreement (PMA). Both Angela and Donald had been married before, and Angela wanted to protect her assets prior to marrying Donald. The parties listed their assets and liabilities in separate attachments to the PMA. Angela identified an ownership interest in three Taco John's restaurants, a home, an investment account, and two vehicles. Donald was working as a financial advisor for Edward Jones at the time. He listed "0 assets" in his financial statement attached to the PMA.

[¶3.]    For the first few years of their marriage, Angela lived in South Dakota, and Donald lived in Minnesota. In 1996, Angela relocated to Rochester, Minnesota to live with Donald. The parties continued to live together in Minnesota until 2011. During a trip to Mexico in January 2011, Angela learned that Donald was having an affair. Donald moved out of their home, but the two attempted to work on their marriage. Ultimately, in January 2012, Donald sued Angela for divorce in Minnesota. The Minnesota court bifurcated the case. It granted the parties a

-1-

divorce in 2014, but left to be determined the issues of spousal maintenance, division of property and debts, attorney's fees, and other financial matters.

[¶4.]     Donald filed a motion with the Minnesota court to establish venue in Olmsted County for the interpretation of the PMA. Angela responded that Butte County, South Dakota was the proper venue. After a hearing, the Minnesota court held "[t]hat Butte County, South Dakota, is the proper venue to determine any issues regarding the validity and enforceability of the parties' Pre-Marriage Agreement."

[¶5.]     In January 2014, Angela filed a declaratory judgment action against Donald in Butte County, South Dakota under SDCL 21-24-3. Angela requested a judgment declaring the PMA valid and enforceable and asked the court to construe the rights and interests of the parties under the PMA. Donald moved to dismiss or stay Angela's South Dakota action so that the Minnesota court could resolve certain pending matters. Donald abandoned his motion to dismiss, and the circuit court scheduled a hearing to determine the validity of the PMA. After a hearing in July 2014, the circuit court issued findings and conclusions declaring the PMA valid and enforceable. The court scheduled a court trial to interpret the PMA "as it relates to the debts and assets of the parties, which decision will be forwarded to the Minnesota Court for use in its distribution of debts and assets in the divorce action between the parties."

[¶6.]     The court trial occurred from April 20-24, 2015, and from August 24-27, 2015. Donald and Angela disputed how the management of their finances impacted the parties' separate and marital property as defined by the PMA. During

the twenty-plus years of their marriage, Angela comingled her separate assets with the parties' marital assets. At trial, Angela asserted that, regardless of any comingling, the PMA mandated that her separate property interests remain separate, thereby significantly reducing the value of the marital estate. Donald, on the other hand, alleged that the language of the PMA required that once either party placed separate funds in the parties' joint marital accounts, the once-separate funds became marital and any purchases with funds from the joint accounts became marital property. According to Donald, the marital estate approximated $6 million dollars.

[¶7.]      To resolve the dispute, Donald and Angela presented separate, detailed, and extensive expert testimony and evidence. Over Donald's objection, the circuit court allowed the admission of Angela's expert's 310-page report. In this report, Value Consulting Group (VCG) used a "tracing" method to track the movement of Angela's separate property interests when Angela placed her separate funds or property interests within the parties' marital accounts. VCG explained that it used a "direct tracing" approach when Angela moved monies from one asset to another asset on the same day or very close in time. VCG used a "pro rata" approach to determine what percentage of an account was marital and what percentage was separate. VCG would then apply this percentage against certain transactions to determine the respective account's separate versus marital property interests at a given time. When VCG could not trace a specific transaction, it would designate Angela's separate interest as a marital interest to benefit the marital estate.

[¶8.] VCG also utilized the concept of "marital loans" to track when Angela used marital funds from the parties' joint accounts for her separate property interests or transferred marital funds from the parties' joint accounts to her separate accounts, and Angela did not have sufficient funds designated as "separate" within the joint accounts. Because Angela did not have sufficient funds designated as "separate" within the joint accounts at the time of the transfer, VCG created "marital loans" in favor of the marital estate. For example, on January 15, 2003, Angela transferred $1,000 from the parties' joint account into one of her separate accounts. According to VCG, on that date, Angela did not have sufficient separate funds in the parties' joint account; thus, the $1,000 Angela transferred to her separate account became a marital loan Angela owed to the marital estate. VCG would keep track of these loans and reduce or eliminate the loans when Angela transferred her separate funds into the parties' joint account at a later date.

[¶9.] VCG utilized the tracing and marital loan methodologies for all transactions between 1993 and 2013. Although the parties had multiple investment and bank accounts, in this appeal, the parties primarily refer to transactions to and from Angela's separate investment account—"7191"—and to and from the parties' joint investment account—"7183." Edward Jones held both investment accounts, and Donald was the financial advisor. Angela did not have check-writing privileges on her separate account (7191), but the parties' joint account (7183) had check-writing capabilities.

[¶10.] Donald's experts disputed VCG's tracing and marital loan methodologies. Donald's experts from Baker Tilly opined that, under the terms of

the PMA, any use by either party of funds from the parties' joint accounts to acquire property and investment or business interests rendered the acquired assets marital property. Donald and his experts relied on the language in the PMA denoting that the purpose of the joint marital account was to acquire marital property and pay ordinary living expenses from and after the date of the marriage. In Donald's view, any money placed in the joint accounts by Angela became marital and, therefore, any property interests obtained with money that was part of a joint account became marital property. In objecting to VCG's expert opinion on the marital loan concept, Donald argued that VCG's report lacked foundation because Angela testified that neither she nor Donald intended to create loans when one or the other transferred money from joint accounts and deposited the money in his or her personal accounts.

[¶11.] After the lengthy trial, the parties submitted proposed findings and conclusions and objections. On April 8, 2016, the court issued 622 findings of fact and 56 conclusions of law comprising 188 typewritten pages. The court began by detailing the history of the parties' marriage, the procedural history of the case, the qualifications and foundation for each expert's testimony, and the language of the PMA. The court then identified the pre-marital assets and their values. The court also listed the assets and business interests identified in VCG's report. The court explained its interpretation of the PMA and concluded that the PMA permitted the use of tracing and marital loans.

[¶12.] The court did not make a specific fact finding on each event of tracing or marital loan occurring between 1993 and 2013. It instead explained that it provided "a sampling of tracing" that occurred. As an example, the court noted that

the parties had stipulated that the value of a particular business interest was $1,220,000. Through the use of VCG's testimony on tracing and the marital loan concept, the court found that the parties used a portion of Angela's separate property interest to make capital contributions toward the acquisition of the business interest because Angela's separate funds were placed into the joint account close in time to the parties' acquisition of this asset. The court traced all transactions related to that particular business asset, and because the parties used a portion of Angela's separate property to acquire it, the court concluded that of the $1,220,000 value, $1,023,967 was Angela's separate property interest and $196,033 was marital.

[¶13.] On appeal, Donald does not challenge the court's factual findings in particular. Nor does he dispute the court's list of assets to be valued and the values placed on those assets by the court. Donald also does not dispute the details of VCG's tracing report in relation to particular assets. Rather, Donald contends that the circuit court erred when it interpreted the PMA to permit—in any respect— tracing and marital loans through and to the joint marital account. We, therefore, limit the remaining discussion of the circuit court's findings and conclusions to Donald's issues on appeal.

[¶14.] In regard to the PMA, the court held that the tracing and marital loan methodologies used by VCG "are appropriate" and are "in accordance with the contract terms set forth in the PMA." The court also recognized that South Dakota law allows for the use of tracing. "'Tracing' is an equitable principle which allows a party with the right to property to trace that property through any number of

-6-

transactions in order to reach the final proceeds or result." *Temple v. Temple*, 365 N.W.2d 561, 567 (S.D. 1985). The court noted that Angela's and Donald's experts "agree that when a PMA is involved in tracing, the methodology is tailored to the terms of the contract, thereby departing from the standard methodologies because of the contract terms." The court rejected Donald's argument that under the PMA all property purchased with funds from the parties' joint account became marital property. In the court's view, Donald "isolate[d] one sentence in Paragraph 7 of the PMA to support his claim" and ignored the contract language that the comingling of separate property shall not change separate property to marital property. The court also relied on PMA language that the comingling of separate property with the other party's property or with marital property shall not be construed as evidence of an intent to change the character of the separate property.

[¶15.] Donald appeals, asserting the following issues for our review:

1. The circuit court erred when it interpreted the PMA to allow tracing of earnings or property through the joint marital account and applied the marital loan concept.

2. The circuit court erred when it adopted Angela's expert's report.

3. If tracing and the marital loan concept are allowed, mutual consent did not exist.

Angela moves this Court for an award of appellate attorney's fees.

## Standard of Review

[¶16.] Our standard of review for contract interpretation is well-settled:

"'Contract interpretation is a question of law' reviewed de novo." *Detmers v. Costner*, 2012 S.D. 35, ¶ 20, 814 N.W.2d 146, 151 (quoting *Clarkson & Co. v. Cont'l Res., Inc.*, 2011 S.D. 72, ¶ 10, 806 N.W.2d 615, 618). "When interpreting a contract, this Court

looks to the language that the parties used in the contract to determine their intention." *Id.* (quoting *Clarkson & Co.*, 2011 S.D. 72, ¶ 15, 806 N.W.2d at 619). "In order to ascertain the terms and conditions of a contract, we examine the contract as a whole and give words their plain and ordinary meaning." *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 2007 S.D. 34, ¶ 13, 731 N.W.2d 184, 191 (quoting *Canyon Lake Park, L.L.C. v. Loftus Dental, P.C.*, 2005 S.D. 82, ¶ 17, 700 N.W.2d 729, 734).

*Poeppel v. Lester*, 2013 S.D. 17, ¶ 16, 827 N.W.2d 580, 584.

### Analysis

[¶17.] The language of the PMA controls the resolution of this case. The PMA contains a "Purpose and Intent" section and identifies four specific purposes. First, the PMA is intended "to specifically identify the separate assets and liabilities of each party accumulated prior to the marriage and existing as of the date of this Agreement[.]" Second, it is intended "to relinquish the right of each party that may or will arise solely by virtue of the marriage relationship as against the separate property of the other[.]" Third, the PMA intended "to define the rights of each party to the property acquired during the course of the marriage[.]" Fourth, the parties intended the PMA "to recognize the rights of each party to dispose of separate property during their lifetime and upon death."

[¶18.] The next section discusses the parties' disclosure of assets. Following that is a section titled, "Separate Property." This section contains six subsections:

> A. Each party acknowledges and agrees that all property acquired and owned by the other as of the date of this Agreement *shall be and remain the sole and separate property of that party.* Each party, for himself or herself, and his or her heirs, executors, administrators, successors and assigns specifically relinquishes and disclaims any and all right, title, interest and claim of every kind or nature, regardless of the nature or source of that right, which will or may otherwise arise by virtue of the marriage.

B. During lifetime, each party shall retain the sole and separate ownership and control of his or her separate property, and shall be free to manage, sell, control or otherwise dispose of such separate property.

C. Separate property as used in this Agreement shall include not only the assets described on attached Exhibits "A" and "B" but *shall also include gains, income, income, [(sic)] interests, dividends, profits, and any other increases in value or decreases in debt, and issues therefrom.*

D. Each party shall be free to replace assets owned by him or her at the time of this Agreement, and to sell or otherwise receive proceeds attributable to separate property of each. *The replacement and proceeds of separate property shall be and remain separate property, and shall not lose their character as separate property solely by change of the form or nature of the asset.*

E. Property received by either party through gift or inheritance shall remain the sole and separate property of the party so receiving or inheriting.

F. Employment benefits including, but not limited to, pension, profit-sharing or any other employee benefit programs or plans shall remain the sole and separate property of the party so employed, and such benefit plan shall remain separate property, even following the marriage of the parties. Each party relinquishes any claim, right, interest or title to the employee benefit plans of the other, and such plans shall not be subject to division in the event of death, separation, or dissolution of the marriage.

(Emphasis added.)

[¶19.] The PMA also contains a section titled, "Marital Property." It begins with a qualification: "Except as specifically provided above[.]" It then provides that "property acquired by the parties from and after the date of their marriage, and continuing throughout the marriage, shall be deemed marital property." It further provides, "No waiver, release or relinquishment of any right, title, claim or interest

in and to the separate property of the other shall be construed as a relinquishment of any right or interest in marital property." And "[p]roperty acquired from and after the date of the marriage, and continuing through the course of the marriage, shall remain marital property regardless of designation of title or ownership of such assets."

[¶20.] The PMA accounts for commingling of assets in a section titled, "Commingling." The PMA directs that the "[p]arties shall use their best efforts to prevent any commingling of separate property." But "[t]he commingling of separate property, or the failure to segregate separate property, *shall not be construed as to change the character of separate property or otherwise result in a change of separate property to marital property*." (Emphasis added.) Further, under the "Oral Statements" section, the PMA provides that "[n]o statement or act by either party, from and after the date of this Agreement, shall have the effect of amendment, of modifying this Agreement." The section continues: "[U]nder no circumstances shall the following events, either individually or collectively, be construed as evidence of any intention, express or implied, or of any agreement, actual or implied, to change the character of separate property[.]" Relevant here are subsections C and F. Under subsection C: "[t]he commingling of either spouse of his or her separate funds with the separate or separate funds of the other party or with any marital property[.]" And subsection F provides: "In the event that marital property or separate property of either party is contributed toward separate property or debt of the other, *such contribution shall be deemed a loan*, payable on demand, without interest, unless the parties agree otherwise, in writing." (Emphasis added.)

[¶21.]     The PMA provides for the payment of ordinary living expenses through a joint bank account. It says, "The parties agree to create, upon marriage, a jointly owned bank account, and each agrees to deposit into such account, earnings or separate property, at an amount necessary to pay ordinary and necessary living expenses of the parties, and any acquisition of marital property." In regard to debts, the PMA contains five subsections. Relevant here is subsection C. Under subsection C: "The parties shall be mutually liable only for debts incurred in the name of both parties, and with the specific knowledge, consent and written undertaking of any such obligation. *Neither party shall bind, or attempt to bind, the other to any indebtedness except on written consent.*" (Emphasis added.)

> **1. Did the circuit court err when it interpreted the PMA to allow tracing of earnings or property through the joint marital account and applied the marital loan concept?**

### a. Tracing of earnings or property

[¶22.]     Donald agrees that the PMA provides for the parties to maintain separate assets and for the proceeds from those separate assets to remain separate property. But he claims that Angela's act of transferring separate funds to the parties' joint account relinquished Angela's rights in her separate funds. Donald emphasizes that the PMA states only two purposes for the joint account and neither purpose is to allow either spouse to maintain a separate interest in the funds of the joint account. To conclude otherwise, according to Donald, requires litigating what funds each party wants to be marital, which "interpretation invites post hoc revisionist history." As proof, Donald directs this Court to Angela's testimony where she said she "had no idea of her intent" when she transferred money from her

separate accounts to the parties' joint accounts.  In Donald's view, "[t]he plain language of the PMA [does] not require such speculation, guesswork, or conjecture about the joint marital account. . . .  Once a party made a decision to deposit separate earnings or property into the joint marital bank account the decision, or 'intent' was clear."

[¶23.]        As the circuit court found, Donald's interpretation of the PMA focuses on one provision—the language governing the creation and use of a joint marital bank account.  But we construe contracts "in their entirety giving contextual meaning to each term."  *Spiska Eng'g, Inc. v. SPM Thermo-Shield, Inc.*, 2007 S.D. 31, ¶ 21, 730 N.W.2d 638, 646 (quoting *Bunkers v. Jacobson*, 2002 S.D. 135, ¶ 15, 653 N.W.2d 732, 738).  Even so, the provision Donald relies on does not support Donald's interpretation.  Yes, the parties agreed to create a joint account and to fund the account "at an amount necessary to pay ordinary and necessary living expenses of the parties, and any acquisition of marital property."  Beyond the creating and funding of the joint account for those purposes, there is no language indicating that the parties also agreed to, without qualification, relinquish their separate property interests in the funds of that joint account solely because that party commingled separate funds with funds in the joint account.

[¶24.]        On the contrary, the terms of the PMA specifically speak to the parties' intent to protect separate property regardless of any act by either spouse.  Under the PMA, "all property acquired and owned by the other as of the date of this Agreement shall be and remain the sole and separate property of that party."  This includes gains, income, interests, dividends, profits, any other increases in value or

decreases in debt, and the "proceeds attributable to separate property[,]" which "shall be and remain separate property, and shall not lose their character as separate property solely by change of the form or nature of the asset." Donald does not dispute that Angela's funds placed in the parties' joint account were her separate property and/or the proceeds of her separate property. Moreover, the PMA contemplates that the parties might commingle and provides that one party's commingling of separate property "shall not be construed as to change the character of separate property or otherwise result in a change of separate property to marital property." This includes when either party "fail[s] to segregate separate property[.]" In fact, the PMA provides that "under no circumstances shall" the commingling of separate funds by either spouse with marital property "be construed as evidence of any intention, express or implied, or of any agreement, actual or implied, to change the character of separate property[.]"

[¶25.] However, Donald directs this Court to the provision in the PMA defining "Marital Property." He highlights the phrases: "shall remain marital property" and "shall remain marital property regardless of designation of title or ownership of such assets." According to Donald, because money in the joint account funds the acquisition of marital property, property acquired with funds from the joint account *shall* remain martial property. He also contends that the provision defining marital property contemplates that the parties can relinquish their interests in separate property.

[¶26.] But Donald's interpretation of the PMA does not "give[] a reasonable and effective meaning to all the terms[.]" *See Nelson v. Schellpfeffer*, 2003 S.D. 7, ¶

14, 656 N.W.2d 740, 744. His interpretation of the provision defining marital property ignores the opening clause qualifying the definition of "Marital Property" with the six subsections defining "Separate Property[.]" The definition of separate property provides that separate property and the proceeds of separate property are "not [to] lose their character as separate property solely by change of the form or nature of the asset." Donald also misconstrues the sentence describing that "[n]o waiver, release or relinquishment of any right, title, claim or interest in and to the separate property of the other shall be construed as a relinquishment of any right or interest in marital property." That sentence does not say that one party's use of separate funds to acquire a marital asset means the person relinquished his or her separate property interest in that asset. Again, the PMA provides that "the failure to segregate separate property, shall not be construed as to change the character of separate property or otherwise result in a change of separate property to marital property."

[¶27.]     Nonetheless, Donald emphasizes that Angela had separate accounts available to her throughout the marriage to preserve her separate assets. He further notes that Angela admitted that VCG's tracing methodology was not based on her interpretation of the PMA and that she did not contemplate tracing her separate property interests when she deposited her separate funds in the joint account during the marriage. But, under the clear terms of the PMA, Angela's act of commingling her separate funds with the parties' marital property during the marriage could not under any circumstances "be construed as evidence of any intention, express or implied, . . . to change the character of separate property[.]"

The PMA is unambiguous, and we interpret the parties' intent from the language of the contract. The PMA accounts for commingling, and the circuit court did not err when it interpreted the PMA to allow for tracing.

### b. *Marital loans in the joint marital account*

[¶28.]     Donald argues that the concept of "marital loans" is a fiction created by Angela's expert and not supported by the PMA. He cites to Angela's testimony that neither she nor Donald borrowed money from the parties' joint account and that when she transferred marital funds from the parties' joint account into her separate account, she did not mean for it to be a loan that she would owe to the marital estate. He also argues that if the PMA permits marital loans, the loans are "indebtedness" under the PMA, which could only occur with written consent of the parties.

[¶29.]     Yes, the PMA provides that the parties must consent in writing before binding the other party to any "indebtedness." Specifically, it provides that "[t]he parties shall be mutually liable only for debts incurred in the name of both parties, and with the specific knowledge, consent and written undertaking of any such obligation." But VCG's use of the marital loan concept did not cause Angela to bind Donald to any indebtedness. The marital loans were debts against Angela in favor of the marital estate. And the PMA provides that "[d]ebts incurred by either party after the marriage, relating to the separate property of each party, shall be and remain the sole obligation of the party which incurred the debt."

[¶30.]     VCG's use of the marital loan concept is supported by the PMA. The PMA provides: "In the event that marital property or separate property of either

party is contributed toward separate property or debt of the other, such contribution shall be deemed a loan, payable on demand, without interest, unless the parties agree otherwise, in writing." Here, Angela transferred marital funds from the parties' joint account to her separate account. Under the PMA, the transfer of these marital funds created a "loan" and Donald did not present evidence that the parties specifically agreed that Angela's transfers (at the time of her transfers) were not to be deemed loans.

### 2. Did the circuit court err when it adopted Angela's expert's report?

[¶31.] Donald claims that the circuit court erred when it did not grant his request to reject VCG's report. At trial, Donald moved the court to reject VCG's report after Angela testified that she did not intend to trace her separate funds to and from the parties' joint account and did not intend to create marital loans. According to Donald, the basis of VCG's expert opinion is no better than the facts upon which it was based and, in Donald's view, cannot rise above Angela's testimony that she did not contemplate tracing and marital loans.

[¶32.] On the contrary, VCG's report was not based on Angela's opinions and views on the concepts of tracing and marital loans. VCS's report was based on the unambiguous language of the PMA, which the circuit court properly interpreted to permit VCG's use of the tracing and marital loan methodologies. So while "[t]he value of the opinion of an expert witness is no better than the facts upon which it is

based[,]" VCG's expert opinions rest on adequate foundation. *See Johnson v. Albertson's*, 2000 S.D. 47, ¶ 25, 610 N.W.2d 449 (quoting *Bridge v. Karl's, Inc.*, 538 N.W.2d 521, 525 (S.D. 1995)). The circuit court did not err when it admitted VCG's report.

### 3. If tracing and the marital loan concept are allowed, was there mutual consent?

[¶33.] According to Donald, if we conclude that, under the PMA, "tracing is appropriate, and that a separate interest was maintained in the joint marital account, neither party understood that." He emphasizes that both parties testified that there were no marital loans and that Angela did not contemplate tracing her funds when she transferred them from her separate account to the parties' joint account. He argues that mutual consent cannot exist when neither party believed that their actions involved tracing or the creation of marital loans.

[¶34.] Although consent is an essential element of a contract, Donald did not appeal the circuit court's order declaring the PMA valid and enforceable. By finding the PMA valid and enforceable, the circuit court necessarily concluded that all essential elements to a contract existed. Under SDCL 53-1-2, those elements include: "(1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and (4) Sufficient cause or consideration." Donald's dispute at this point is with the interpretation of the language of the PMA permitting tracing and marital loans (which issues we addressed above), not whether he mutually consented to the terms of the PMA.

### 4. Appellate Attorney's Fees

[¶35.] Angela moves this Court for an award of appellate attorney's fees under SDCL 15-26A-87.3. She asserts that an award of fees is allowable under SDCL 15-17-38. Donald responds that an award of fees is unwarranted under SDCL 15-17-38 because the matter on appeal challenges a circuit court's ruling in a civil action and the PMA does not contain a provision allowing an award of attorney's fees.

[¶36.] Appellate attorney's fees may be granted under SDCL 15-26A-87.3 "where such fees may be allowable[.]" We have said this means that we may grant appellate attorney's fees "only where such fees are permissible at the trial level." *Lord v. Hy-Vee Food Stores*, 2006 S.D. 70, ¶ 35, 720 N.W.2d 443, 455 (quoting *Grynberg Exp. Corp. v. Puckett*, 2004 S.D. 77, ¶ 33, 682 N.W.2d 317, 324). Here, attorney's fees would not have been permissible at the trial level and, therefore, are not permissible on appeal. Angela instituted this civil action in a South Dakota court for a declaratory judgment to interpret a contract. Under SDCL 15-17-38, an award of fees is permitted in a civil action when there is an "agreement, express or implied, of the parties." Angela directs us to no language in the PMA permitting an award of attorney's fees.

[¶37.] Angela, however, relies on SDCL 15-17-38 in general. Similarly, the dissent contends that SDCL 15-17-38 allows for an award of fees because "this declaratory action is a necessary part of the parties' divorce." *Dissent* ¶ 42. But that statute does not say that fees are allowable in a separate civil action for declaratory relief so long as the civil case *relates* to a separate divorce case. Instead,

a court may award attorney's fees "in all *cases* of divorce, annulment of marriage, determination of paternity, custody, visitation, separate maintenance, support, or alimony." (Emphasis added.) This appeal concerns none of the types of cases listed—it is an appeal from a civil action interpreting a contract as it relates to ownership of property.

[¶38.] In *Toft v. Toft*, we upheld an award of attorney's fees in litigation that "occurred in the context of the divorce because '[i]t is well settled in this state that a divorce court has continuing jurisdiction over its decrees,' and '[a]n application for modification or enforcement of such decree is a supplementary proceeding incidental to the original suit. It is not an independent proceeding or the commencement of a new action.'" 2006 S.D. 91, ¶ 21, 723 N.W.2d 546, 553 (quoting *Weekley v. Weekley*, 1999 S.D. 162, ¶ 25, 604 N.W.2d 19, 25). Here, in contrast, Angela's declaratory action is not a supplemental action incidental to the original suit for divorce in Minnesota, and the South Dakota circuit court's jurisdiction over Angela's action did not arise out of the parties' divorce proceedings. On the contrary, Angela commenced an independent proceeding over which the Minnesota divorce court has no jurisdiction. Moreover, even though the Minnesota court will apply the South Dakota court's interpretation of the PMA, the resolution of the validity and enforcement of the parties' PMA in South Dakota is not a "case[] of divorce" under SDCL 15-17-38. Because this appeal arises from a declaratory judgment action to interpret a premarital agreement and did not concern the categories permitting an award of fees under SDCL 15-17-38, we deny Angela's request for appellate attorney's fees.

[¶39.]     Affirmed.

[¶40.]     GILBERTSON, Chief Justice, and SEVERSON, Justice, concur.

[¶41.]     ZINTER, and KERN, Justices, concurring in part and dissenting in part.


ZINTER, Justice (concurring in part and dissenting in part).

[¶42.]     I concur on all issues concerning interpretation of the premarital agreement (PMA). I dissent only on the majority's conclusion that attorney's fees are not awardable under SDCL 15-17-38. In my view, this declaratory action is a necessary part of the parties' divorce. Therefore, the recovery of attorney fees is authorized by the statute.

[¶43.]     SDCL 15-17-38 permits an award of attorney fees "in all cases of divorce." We have interpreted the "in all cases of" phrase to mean that fees are recoverable in all cases "involving" divorce, *see Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 55, 826 N.W.2d 627, 644, as well as cases "in the context of" divorce, *Toft v. Toft*, 2006 S.D. 91, ¶ 21, 723 N.W.2d 546, 553. We have also interpreted the "in all cases of" phrase broadly for other types of cases not specifically itemized in SDCL 15-17-38. *See Brosnan v. Brosnan*, 2013 S.D. 81, ¶ 38, 840 N.W.2d 240, 252 (concluding that attorney's fees in a *relocation* action were awardable because cases "*involving* relocation of a child are *necessarily* disputes *regarding*" custody and visitation, which are cases mentioned by the statute); *Osgood v. Osgood*, 2004 S.D. 22, ¶¶ 18-22, 676 N.W.2d 145, 151-52 (upholding award of fees for grandparent visitation under prior version of statute that did not include cases of visitation).

[¶44.] This declaratory judgment action not only involved divorce, it was a necessary part of the Charlsons' Minnesota divorce. The Minnesota court granted the parties a divorce; but it could not determine the issues of spousal maintenance, property division, and other financial matters because the PMA had a Butte County, South Dakota venue provision. Consequently, the Minnesota divorce court ruled that South Dakota was the proper venue to determine the PMA's validity and enforceability; and the South Dakota Court ruled that its decision on the PMA's validity and enforceability would "be forwarded to the Minnesota Court for *use* in its distribution of debts and assets in the *divorce* action between the parties." *Supra* ¶ 5 (emphasis added). Thus, although the parties requested declaratory relief in this case, it was not an independent, run-of-the-mill declaratory judgment action involving the interpretation of a contract. The South Dakota proceeding was a necessary part of the Minnesota divorce: it was brought at the direction of the Minnesota divorce court to adjudicate the usual and customary divorce issues arising in the parties' divorce action.

[¶45.] Interpretation of premarital agreements by South Dakota courts is a divorce matter entitling the litigants to recover attorney fees under SDCL 15-17-38. *See Smetana v. Smetana*, 2007 S.D. 5, ¶ 22, 726 N.W.2d 887, 895 (awarding appellate attorney's fees in divorce action interpreting an antenuptial agreement). Further, this was a case "involving" divorce, *see Schieffer*, 2013 S.D. 11, ¶ 55, 826 N.W.2d at 644, it was a case brought "in the context of" divorce, *see Toft*, 2006 S.D. 91, ¶ 21, 723 N.W.2d at 553, and it was a case "necessarily regarding" divorce, *see Brosnan*, 2013 S.D. 81, ¶ 38, 840 N.W.2d at 252. Indeed, it was a

necessary part of a divorce.  Therefore, I would hold that recovery of attorney fees is authorized by SDCL 15-17-38.

[¶46.]        KERN, Justice, joins this special writing.