#28290, #28304-a-GAS
**2018 S.D. 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*


MINDY MARIE GIESEN,                              Plaintiff and Appellee,

    v.

DAVID MICHAEL GIESEN,                         Defendant and Appellant.


\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE VINCENT A. FOLEY
Retired Judge

\* \* \* \*


DAVID R. STRAIT of
Austin, Hinderaker, Hopper,
  Strait & Benson, LLP
Watertown, South Dakota                         Attorneys for plaintiff
                                  and appellee.


GREGORY T. BREWERS of
Strange, Farrell, Johnson
  & Brewers, P.C.
Sioux Falls, South Dakota                        Attorneys for defendant
                                  and appellant.


\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 19, 2018
OPINION FILED **04/25/18**

SEVERSON, Justice

[¶1.] In this divorce action, the husband challenges the circuit court's valuation of his three business interests, the valuation of a bank account on a date other than the date of divorce, and the decision to recapture into the marital estate the value of home improvements made to a third party's rental property. We affirm.

## Background

[¶2.] Mindy Giesen brought suit for divorce against David Giesen in April 2015. Two children were born during the marriage. At the time of the October 2016 trial, Mindy and David had been married approximately sixteen years. When the trial concluded, the circuit court stated certain rulings on the record and reserved ruling on others. In particular, the court reserved ruling on fault, the property division, and Mindy's request for alimony. This appeal concerns the circuit court's valuation and division of property.

[¶3.] In November 2015, the circuit court issued a detailed memorandum decision valuing and allocating the parties' assets and debts. The court's February 2017 memorandum decision set forth the terms of David's cash equalization payment to Mindy to be made as part of the property division. On May 23, 2017, the circuit court entered findings of fact and conclusions of law which specifically incorporated the previous memoranda decisions. On the same day, the court entered a judgment and decree of divorce.

[¶4.] Because this appeal concerns the valuation of David's business interests, the valuation of a bank account, and the court's decision to include

$15,000 of improvements made to the property rented by David, we detail only the facts and evidence relevant to those issues.

[¶5.]      In 1998, David and his father Norm Giesen entered the trucking business. At the time, David had been working as a diesel mechanic in Norm's shop. After they entered the trucking business, Norm drove truck while David managed his father's shop. Within the first two years, they added a second truck and hired an owner/operator. In 2002, David and Norm incorporated their business as Dakota Valley Trucking, Inc. They each owned 50% of the trucking operation. In 2007, David and Norm started a second trucking operation: Dakota Valley Logistics, Inc. Like Dakota Valley Trucking, David and Norm each owned 50% of Dakota Valley Logistics. David testified that he and Norm began Dakota Valley Logistics because Dakota Valley Trucking had more loads than it could handle. To handle the additional loads, Dakota Valley Logistics operated as a bonded brokerage firm that brokered out loads to other companies.

[¶6.]      In 2008, David individually purchased a truck and started a sole proprietorship. David testified that he started his sole proprietorship because he wanted to "have a truck of [his] own." He explained that he occasionally drove truck but that he hired drivers for his sole proprietorship. David, through his sole proprietorship, contracted with Dakota Valley Trucking as an independent contractor. He testified that his contracts with Dakota Valley Trucking were the same as the other independent contractors. David offered the following example of how a driver is paid for a load.

> [I]f we haul for one company, we bid a load. Roughly say going
> to Los Angeles, we bid the load for $5,000. The driver would get

> 26 percent of that $5,000.  Dakota Valley would get 10 percent.
> If say it's [David's] truck and [his] trailer, [he] gets the rest
> [(64%)].

On cross-examination, David agreed that he started his sole proprietorship to build assets and equity and to allow himself to generate more revenue personally.

[¶7.] David testified that as part of his employment with Dakota Valley Trucking, he received a wage (approximately $35,000), and Dakota Valley Trucking issued him a W-2 for those wages.  Dakota Valley Trucking also transferred David money in the form of a 1099 (1099 transfers).  David claimed that the money was for services rendered as an independent contractor.  Regardless, David reported his share of Dakota Valley Trucking's revenue on his personal tax return Schedule C, which number was usually around $300,000 per year.  On cross-examination, David admitted that Dakota Valley Trucking had the choice to retain its revenue and buy its own trucks instead of distributing it to David.  David explained, "If we wanted to purchase a truck through Dakota Valley Trucking, yes, but I want to purchase a truck through myself."

[¶8.] David and Mindy presented separate expert testimony on the value of David's three business interests: 50% ownership in Dakota Valley Trucking, 50% ownership in Dakota Valley Logistics, and 100% ownership of the sole proprietorship.  David had hired Eide Bailly to calculate the value of his business interests.  Kevin Teigen, a business valuation manager from Eide Bailly, testified at trial.  He did not participate in or create Eide Bailly's reports on David's business interests.  Mindy had hired Michael Snyder, an accountant and lawyer, to offer an opinion on the value of David's business interests.  Snyder testified at trial.

[¶9.]     The following chart represents the respective valuations offered by the experts, rounding to the nearest thousand.

|  | Snyder | Eide Bailly/Teigen |
|---|---|---|
| Dakota Valley Trucking | $1,375,000 | $378,000 |
| Dakota Valley Logistics | $102,000 | $56,000 |
| Sole Proprietorship | $178,000 | $85,000 |

The parties do not dispute that their respective experts used different methods. Eide Bailly performed a calculation engagement and Snyder performed a valuation engagement.

[¶10.]    The difference between the two types of engagements was explained in Eide Bailly's report and was recognized by the circuit court. "A calculation engagement is limited in scope to the extent that the valuation analyst and the client agree on the valuation approaches and methods to be performed; the results of these procedures are expressed as a calculated value." In contrast, under a valuation engagement, "[t]he valuation analyst is free to apply the valuation approaches and methods he or she determines appropriate in the circumstances. The valuation analyst expresses the results of the valuation analysis as a conclusion of value."

[¶11.]    In resolving the disparity between the expert's valuations of David's business interests, the circuit court found Eide Bailly's calculation engagement "problematic in the context of this case." In particular, the court quoted language from Eide Bailly's separate reports, which indicated that David and Eide Bailly "have agreed upon the specific valuation approaches and valuation methods to be performed." The court noted that, in contrast, Snyder was free to apply valuation methods and approaches he determined necessary. The circuit court also quoted

and emphasized the language contained in each of Eide Bailly's reports, which provided: "This calculation engagement did not include all the procedures required for a conclusion of value. Had a conclusion of value been determined, the results may have been different than presented."

[¶12.] Additionally concerning, according to the court, was the fact that Eide Bailly relied upon information from David about the value of the assets and on explanations supplied by David related to the financial information when it arrived at its calculated value for each business. In the court's view, although Eide Bailly presented an "impressive portfolio of reports," "the underpinnings of the report create substantial questions." Further, the court found it problematic that Teigen from Eide Bailly "lacked personal knowledge of the determinations made in pursing the calculated value."

[¶13.] Before valuing David's business interests, the circuit court stated the following facts it deemed important: "1) the lack of control [because of the 50/50 ownership] is a deadlock not control by the other; 2) the other stockholder is [David's] father with whom there is an apparent unity of direction; and 3) between [David and Norm] there is an apparent ability to create a business model that allows [David] to create a 100% owned business in competition with the 50% owned business." The court explained that these important facts, "when taken in context of this case, together with [Dakota Valley's] 1099 transfers to [David's] sole proprietorship," left the court "with a morass of information on the valuation of the three entities."

[¶14.] Working through the morass of information, the court pointed out that Eide Bailly used different valuation methods for the corporate entities as compared to David's sole proprietorship. The court noted that Eide Bailly's shifts in valuation methods between the business interests omitted an "important transaction element of the business operations, thereby overlooking the impact of the 1099 transfer and consequent revenue stream." In the court's view, the shifts in valuation did not account for the interrelatedness of the businesses. According to the court, the 1099 transfers from Dakota Valley Trucking to David allowed David to "expand his sole proprietorship operation through the purchase of depreciable assets which allowed him to increase his own revenue stream."

[¶15.] Therefore, the court declined to adopt Eide Bailly's valuation method for Dakota Valley Trucking and Eide Bailly's valuation for the sole proprietorship because Eide Bailly did not adequately account for the 1099 transfers. To conclude otherwise, according to the court, would cause the revenue stream to David to "disappear as a contribution to value" to David's "global operation." But the court noted that a "dilemma" existed as to "where to give [the 1099 transfers] a home and value it."

[¶16.] We note that the court explained that its criticism of Eide Bailly's calculation of value did not mean "that the Eide Bailly reports and value should be discarded, [or] that Snyder's report should be adopted." Rather, according to the court, the fact Eide Bailly was engaged by David "to perform a calculated valuation raise[d] serious questions, and when combined with the methodology and

assumptions, create[d] serious questions for the [c]ourt on the value of the ultimate opinion."

[¶17.] In valuing Dakota Valley Trucking, the court found Snyder's testimony and evidence persuasive. Snyder's valuation accounted for the 1099 transfers to David by attributing David's Schedule C income back with Dakota Valley Trucking, because, according to Snyder, the transfers to David were not a normal expense of the corporation. The circuit court agreed and indicated that the issue of the 1099 transfers led it to adopt a valuation figure in the upper range because "[t]he lower range values do not include a full revenue picture due to the income shifting." The court explained that "[f]or purposes of this decision and consequent division of property, the 1099 issue is left inside [Dakota Valley Trucking]." The court indicated that it was "mindful of the risk of the operation into the future" and that David should not be punished for the business arrangement that exists with his father. The court valued David's interest in Dakota Valley Trucking at $850,000.

[¶18.] For Dakota Valley Logistics, the court adopted the figure offered by Snyder—$102,000. Eide Bailly had valued the business at $56,000 and had applied a marketability discount. The circuit court, however, concluded that a marketability discount would not be applied. Therefore, it removed the marketability discount from Eide Bailly's valuation, applied a lack of control discount, and determined Eide Bailly's adjusted valuation would be: $74,000. However, the court reiterated that Eide Bailly's "application of the calculated method through agreement with David leaves out a very important component of the three operations"—the 1099 transfers. In the court's view, the marginally

higher figure ($102,000 versus $74,000) was warranted because of "the synergy obtained through the joint operation with [Dakota Valley Trucking.]" Lastly, the court valued the sole proprietorship at $178,000 because of the "strength of the sole proprietorship due to its inherent conflict with [Dakota Valley Trucking]."

[¶19.]     This appeal also concerns the circuit court's decision to value and include in the marital estate the improvements made to the property rented by David from his father. After Mindy and David separated, Norm purchased a house in Milbank, South Dakota. David resided in the rental property. While residing there, David obtained and paid for a building permit to construct a deck on the rental property and a detached garage. At trial, David admitted to being involved in the construction of the improvements but denied personally spending money on the improvements other than for the building permit. He admitted that the value of the improvements was approximately $30,000, materials for the garage were approximately $12,000, and materials for the deck were approximately $3,000. Mindy testified that she estimated the value of the improvements to be approximately $30,000.

[¶20.]     Although David claimed otherwise at trial, the court found that David contributed to the construction of the improvements. The court relied on "the expenses incurred for the improvements on property of another, together with a failure to provide full bank account information, and David's complete lack of candor with the process and with the [c]ourt," as evidence of "a handshake deal." Therefore, the court concluded that the transfer of value from David into Norm's rental property "require[d] recapture into the marital estate[.]" The court found

that David's "information suggest[ed] at least $15,000 was spent on the improvements" and thus included that $15,000 value in the marital estate.

[¶21.] The last property issue David challenges on appeal concerns the circuit court's valuation of one of David's bank accounts. David had two bank accounts at Great Western Bank. During trial, Mindy entered into evidence full and complete bank statements from July 1, 2015 to November 11, 2015 for David's VIP free interest checking account. Mindy testified that she was able to obtain these bank statements personally because during those times, her name was still on the account. The balance on November 11, 2015 was $26,497.40.

[¶22.] Mindy testified that she could not obtain more current and complete information because Mindy's name was removed from the account. She also emphasized that David refused to provide her more accurate information, and instead, turned over only redacted bank statements reflecting the balances on the account. The more recent statement from August 2016 did not contain complete information. Rather, it indicated the balance of $6,716.24. Ultimately, the circuit court valued "the Great Western personal truck account, without further competent proof through unredacted bank accounts," at $26,497.40. The court explained that the "rationale for attributing that figure in that direction is because of the points [counsel] made in cross-examination of the expenditures made by David[.]"

[¶23.] David appeals, asserting:

1. The circuit court abused its discretion when it included the value of the bank account from eleven months before trial.

2. The circuit court abused its discretion when it included $15,000 of improvements made to David's father's rental property.

3. The circuit court abused its discretion and committed clear error when it valued David's business interests.

Mindy filed a notice of review, asserting two issues. She, however, did not brief those issues, and "[a]n assignment of error not briefed and argued is deemed abandoned." *See Sabhari v. Sapari*, 1998 S.D. 35, ¶ 1 n.3, 576 N.W.2d 886, 888 n.3 (quoting *State v. Macy*, 403 N.W.2d 743, 745 (S.D. 1987)).

**Standard of Review**

[¶24.] In *Pieper v. Pieper*, we stated our standard of review:

> We review findings of fact "under the clearly erroneous standard of review." *Schieffer v. Schieffer,* 2013 S.D. 11, ¶ 15, 826 N.W.2d 627, 633 (citation omitted). We will not overturn the trial court's findings of fact unless a "complete review of the evidence leaves this Court with a definite and firm conviction that a mistake has been made." *Id.* (citation omitted). Conclusions of law are reviewed de novo. *Hill v. Hill,* 2009 S.D. 18, ¶ 5, 763 N.W.2d 818, 822 (citation omitted).

2013 S.D. 98, ¶ 41, 841 N.W.2d 781, 789.

**Analysis**

**1. Value of the Bank Account**

[¶25.] David claims that the circuit court abused its discretion when it valued his bank account on a date eleven months before trial. In his view, "there were no special circumstances justifying" the court's valuation date. David also asserts that the court clearly erred when it failed "to use the most recent bank statements available" when valuing his account.

[¶26.] "On review of a property division, this Court will not attempt to place valuations on the assets because that is a task for the trial court as the trier of fact." *Geraets v. Geraets*, 1996 S.D. 119, ¶ 7, 554 N.W.2d 198, 200 (quoting *Schumaker v.*

*Schumaker*, 439 N.W.2d 815, 816 (S.D. 1989)). We, however, will interfere with the circuit court's valuation when the valuation is clearly erroneous. *Id.* We note that "[a]bsent special circumstances, the date of the granting of the divorce is the proper time for the determination of the value of the estate for purposes of a property division." *Id.* ¶ 8 (emphasis omitted) (quoting *Johnson v. Johnson*, 155 N.W.2d 111, 114-15 (Wisc. 1967)); *accord Pieper*, 2013 S.D. 98, ¶ 41, 841 N.W.2d at 789. Also, "[w]e do not require exactitude in the trial court's valuation of assets; it is only necessary that the value lie within a reasonable range of figures." *DeVries v. DeVries*, 519 N.W.2d 73, 75 (S.D. 1994).

[¶27.] From our review of the record, the circumstances warranted the circuit court's determination of value of the bank account on November 2015 rather than August 2016. The record contains bank statements for David's personal and trucking accounts from March 2015 to August 2016. Yet the last complete bank statement in the record was from November 2015. From March of 2015 until November of 2015, during the time complete statements were available to Mindy, David maintained monthly balances of $23,000 to $43,000. After November of 2015, and when Mindy could no longer obtain detailed statements, the monthly account balances steadily declined. David knew Mindy disputed the reason for the reduction in value and that she was requesting the court value the account at a balance higher than the August 2016 balance. Despite this, David presented no evidence to explain the steady decline in the account balance; rather, he relied on a redacted bank statement from August 2016. The circuit court did not abuse its discretion when it relied on the last complete bank statement from November 2015,

and valued David's Great Western Bank account, ending in number #9865, at $26,497.40.

## 2. Improvements Made to David's Father's Rental Property

[¶28.]     David asserts that the improvements made to Norm's rental property were made by Norm. He claims Mindy merely speculated that David had an interest in the construction of the deck and garage. David further contends that Mindy failed to present evidence that David had paid for the improvements or evidence to support that David had any ownership interest in the improvements. According to David, the circuit court clearly erred when it accepted Mindy's speculations.

[¶29.]     Mindy responds that David admitted to being involved in the construction of the improvements and admitted that the value of the improvements was approximately $30,000. She then emphasizes that David refused to provide credit card statements or bank records to confirm that he did not pay for the construction expenses. Mindy further highlights that the circuit court found compelling David's "complete lack of candor with the process and with the [c]ourt[.]" In Mindy's view, the court "was well within its discretion when it decided that the money expended by David needed to be recaptured" into the marital estate.

[¶30.]     It is well settled that the circuit court must consider equity and the circumstances of the parties when it makes a division of property. SDCL 25-4-44. In doing so, the court must determine the credibility of the witnesses that testify at trial. *Grode v. Grode*, 1996 S.D. 15, ¶ 21, 543 N.W.2d 795, 801. Moreover, a "court

is not required to accept either party's proposed valuation." *Johnson v. Johnson*, 2007 S.D. 56, ¶ 41, 734 N.W.2d 801, 811.

[¶31.]     Here, the circuit court considered the evidence and testimony from David and Mindy and found that David had made substantial improvements to his father's rental property. The court appropriately considered David's lack of candor to the court and lack of cooperation in the process. *See, e.g., Pennock v. Pennock*, 356 N.W.2d 913, 915 (S.D. 1984). The court further relied on David's testimony that approximately $15,000 was spent on the improvements. Because David has failed to establish that the circuit court abused its discretion or clearly erred, we affirm the circuit court's decision to recapture $15,000 into the marital estate.

### 3. Value of David's Business Interests

[¶32.]     David claims that both Snyder and Eide Bailly opined that the sole proprietorship should be valued based on a calculation of the fair market value of the assets less the current value of the debts. He further claims that using this approach, Mindy's expert valued the sole proprietorship at $156,831. He suggests that the circuit court unintentionally erred when it ultimately valued the sole proprietorship at $178,000 because, according to David, the court likely mistakenly referenced Snyder's prior and preliminary value of $178,000.

[¶33.]     Snyder issued three opinion letters and testified at trial. In his January 2016 letter, Snyder valued the sole proprietorship at $178,500. In his October 2016 letter, Snyder indicated a preliminary value of the sole proprietorship at $156,831, with specific reservation that the value of additional assets would need to be added to the $156,831 figure. During the trial, Snyder testified that his

valuation of the sole proprietorship in the October 2016 letter assumed that the two corporations were properly valued under an enterprise theory. Snyder further testified about an alternative opinion he offered in the October 2016 letter.

[¶34.] From our review of Snyder's testimony at trial, he did not conclusively opine that he would value the sole proprietorship at $157,000. Nor did he testify that any other valuation would be improper. Even so, the court specifically recognized that $178,000 was Snyder's "original" valuation of the sole proprietorship. Thus, David's impression that the court made an unintentional error does not bear out on a review of the record.

[¶35.] David also claims that the circuit court clearly erred when it valued the sole proprietorship at $178,000 and when it valued the corporations. He spends much of his argument detailing the alleged flaws in Snyder's testimony and reports. The circuit court, however, did not wholesale adopt Snyder's opinions and reasoning or wholesale reject Eide Bailly's.

[¶36.] Nonetheless, David argues that the circuit court erroneously treated the $300,000 in independent contractor payments via the 1099 transfers as a "revenue stream" to David. He claims that the 1099 transfers from Dakota Valley Tucking to him did not take profits away from Dakota Valley Trucking. He further claims that the circuit court failed to account for the expenses related to the operation of the sole proprietorship when it focused on the 1099 transfers. According to David, when the circuit court added the 1099 transfers back into Dakota Valley Trucking as if it were profit to the corporation while also considering

the 1099 transfer as a "revenue stream" in valuing the sole proprietorship, the court double counted the revenue.

[¶37.]    From our review of the record, the court did not treat the 1099 transfers as a revenue stream to David. The circuit court indicated that it did not consider the 1099 transfers to be "transfers to build equity[.]" Rather, according to the court, the 1099 transfers "were payments, albeit to a favored insider, for services rendered." The circuit court also did not fail to account for the expenses related to the operation of the sole proprietorship. Before valuing the three business interests, the court—at length—detailed various methods of valuation. Those valuations indicated that the court considered EBTDA (earnings before taxes, depreciation, and amortization).

[¶38.]    We further conclude that the circuit court did not double count the value of the 1099 transfers when it valued David's three business interests. In the court's view, Eide Bailly's separate and independent calculations of valuation for the three businesses failed to account for the 1099 transfers. Therefore, and so that the value of these transfers would not "disappear as a contribution to value," the court declined to adopt David's "valuation concepts of Dakota Valley Trucking, Inc." and declined to value "the sole proprietorship only on assets[.]" Ultimately, the court determined that the issue of the 1099 transfers justified a valuation of Dakota Valley Trucking in the upper range and accounted for the 1099 transfers within Dakota Valley Trucking. It, however, noted that David "should not be faulted for the structure with his father." Then, in regard to the sole proprietorship, the circuit court did not again account for the 1099 transfers. Rather, it valued the sole

proprietorship at $178,000 because of the "strength of the sole proprietorship's position due to its inherent conflict with" Dakota Valley Trucking.

[¶39.] David further argues that the circuit court should have focused on the existing business model he and his father have always used rather than "presume a business would be more profitable if operated differently[.]" But it is well settled that the circuit court was "not bound by any mathematical formula but shall make such award from the material factors before [it] having due regard for equity and the circumstances of the parties." *Grode*, 1996 S.D. 15, ¶ 9, 543 N.W.2d at 800 (quoting *Hanson v. Hanson*, 252 N.W.2d 907, 908 (S.D. 1977)). Also, the circuit court "is not required to accept either party's proposed valuations, but the value must be within the range of evidence presented to the court." *Orr v. Cook*, 2011 S.D. 31, ¶ 15, 800 N.W.2d 353, 357 (quoting *Johnson*, 2007 S.D. 56, ¶ 37, 734 N.W.2d at 810-11). We will not overturn the circuit court's valuation unless it is clearly erroneous. *Id.* ¶ 6. In applying this standard, we resolve all conflicts in the evidence in favor of the court's valuation. *Grode*, 1996 S.D. 15, ¶ 5, 543 N.W.2d at 799. Moreover, David bears the burden of showing error. *Id.* ¶ 19. From our review of the evidence and testimony, the circuit court's valuations were within the range of evidence presented. Further, David has failed to meet his burden of showing error in the court's treatment of the 1099s in valuing David's three business interests.

[¶40.] David next claims that the circuit court clearly erred when it declined to apply a marketability discount. He asserts that a discount should have been applied because Eide Bailly's reports identified restrictions on transfer and rights of

first refusal in the corporate bylaws for both corporations.  He further emphasizes that Snyder's January 2016 letter applied a 25% marketability discount on the sole proprietorship.

[¶41.]    On the issue of marketability, there is no evidence that the circuit court declined to apply a discount on the sole proprietorship.  Nor does David allege that the circuit court did not apply a discount as it relates to the sole proprietorship.  He merely references Snyder's letter indicating that a marketability discount should be applied to the sole proprietorship.  We, therefore, examine only whether the circuit court erred when it did not apply the discount to the corporations.

[¶42.]    In declining to apply the marketability discount to the corporations, the circuit court relied on *Fausch v. Fausch*, for the proposition that it need not apply the marketability discount when an owner displays no interest in sale, no restrictions on sale exist, and the business would be an attractive investment. 2005 S.D. 63, ¶ 9, 697 N.W.2d 748, 752.  The court identified that the experts disagreed on whether to apply a marketability discount.  Ultimately, the court declined to apply the "discount for the corporations," because the court found no evidence that "the shareholders of both corporations show[ed] any interest in the sale of the business[.]"  It also found that "no evidence was presented on restrictions, and should there be an outright sale the operations would be an attractive investment as reflected by both experts' testimony."

[¶43.]    Although David asserts that the corporate bylaws restrict sale of the businesses, he supports this claim on a statement in the reports prepared by Eide Bailly.  Whether David simply told Eide Bailly that the bylaws restrict sale or

whether David provided Eide Bailly the corporate bylaws for both businesses cannot be discerned from the record. Because there was evidence before the court to support its decision not to apply the marketability discount, David has not established that the circuit court clearly erred.

[¶44.]     David moved for $11,822.94 in appellate attorney fees and costs, and Mindy moved for $7,518.90 for the same. Under SDCL 15-26A-87.3, appellate attorney fees may be awarded "only where such fees are permissible at the trial level." *Charlson v. Charlson*, 2017 S.D. 11, ¶ 36, 892 N.W.2d 903, 913. SDCL 15-17-38 permits an award of attorney fees in cases of divorce. We decline to award David appellate attorney fees. We award Mindy $7,518.90 in appellate attorney fees.

[¶45.]     Affirmed.

[¶46.]     ZINTER, KERN, and JENSEN, Justices, and CONNOLLY, Circuit Court Judge, concur.

[¶47.]     CONNOLLY, Circuit Court Judge, sitting for GILBERTSON, Chief Justice, disqualified.